MORGAN, LEWIS & BOCKIUS LLP
ERIC MECKLEY, SBN 168181
SUZANNE BOAG, SBN 250441
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel: 415.442.1000
Fax: 415.442.1001
emeckley@morganlewis.com

Attorney for Defendants
ARAMARK Sports, LLC and ARAMARK
Corporation

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK ANTOINE FOSTER,<br><br>        Plaintiff,<br><br>        vs.<br><br>ARAMARK SPORTS, LLC and<br>ARAMARK CORPORATION, and DOES<br>1 through 73,<br><br>        Defendants. | Case No. C-08-01336 MHP<br><br>**DECLARATION OF ERIC MECKLEY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY ATTORNEYS ERIC MECKLEY, MELINDA RIECHERT, SUE BOAG, AND MORGAN LEWIS & BOCKIUS LLP**<br><br>Date:     April 28, 2008<br>Time:    2 p.m.<br>Location: Courtroom 15, 18th Floor<br><br>Judge:   Hon. Marilyn H. Patel |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7688036.1

CASE NO. C-08-01336

DECLARATION OF ERIC MECKLEY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY
ATTORNEYS ERIC MECKLEY, MELINDA RIECHERT, SUE BOAG, AND MORGAN LEWIS & BOCKIUS LLP

### Declaration of Eric Meckley

I, Eric Meckley, hereby declare and state as follows:

1.    I am an attorney at the law firm of Morgan, Lewis & Bockius LLP, attorneys of record for Defendants ARAMARK Sports, LLC and ARAMARK Corporation. I am licensed to practice law before all of the Courts for the State of California and the United States District Courts for the Northern, Eastern and Central Districts of California. I have direct and personal knowledge of the facts set forth in my Declaration and, if called and sworn as a witness, I would competently testify to these facts under penalty of perjury. I am submitting this Declaration in support of Defendants' Opposition to Plaintiff's Motion to Disqualify Attorneys Eric Meckley, Melinda Riechert, Sue Boag, and Morgan Lewis & Bockius LLP.

2.    On January 4, 2008, in the lawsuit *Mark Antoine Foster v. ARAMARK Sports, LLC, Ying Kee McVicker, and Matthew Lee,* then pending in San Francisco Superior Court (Case No. C-07-461178) and now pending in this Court (Case No. C-08-00733 MHP), I caused to be served on Plaintiff Mark Antoine Foster and mediator attorney Bruce Highman a confidential Early Settlement Program Settlement Conference Statement in connection with the Early Settlement Conference which the parties were ordered to attend by the San Francisco Superior Court. Attached hereto as Exhibit 1 is a true and correct copy of the complete Early Settlement Conference Statement, except for page 20, which has been redacted to preserve the confidentiality of the parties' settlement negotiations. Plaintiff has previously filed only limited portions of this brief along with his Motion. It is important for the Court to have the entire brief to see the context in which the allegedly "fraudulent" statements were made.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 7th day of April 2008 at San Francisco, California.

Eric Meckley

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7688036.1                             2                           CASE NO. C-08-01336
DECLARATION OF ERIC MECKLEY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY
ATTORNEYS ERIC MECKLEY, MELINDA RIECHERT, SUE BOAG, AND MORGAN LEWIS & BOCKIUS LLP

EXHIBIT 1

1   MORGAN, LEWIS & BOCKIUS LLP
    ERIC MECKLEY, State Bar No. 168181
2   SUZANNE BOAG, State Bar No. 250441
    One Market, Spear Street Tower
3   San Francisco, CA 94105-1126
    Tel:  415.442.1000
4   Fax:  415.442.1001

5   Attorneys for Defendants
    ARAMARK SPORTS, LLC (erroneously sued as
6   ARAMARK Sports and Entertainment), YING KEE
    McVICKER, and MATTHEW LEE
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SAN FRANCISCO

10                      UNLIMITED JURISDICTION

11

12   MARK ANTOINE FOSTER,                 Case No. CGC-07-461178

13              Plaintiff,                **DEFENDANTS' EARLY SETTLEMENT
                                          PROGRAM SETTLEMENT
14        vs.                             CONFERENCE STATEMENT**

15   ARAMARK SPORTS &                     Date:     January 11, 2008
     ENTERTAINMENT, Ying Kee McVicker,
16   an individual, Matthew Lee, an individual,   Action Filed:   March 9, 2007
     and DOES 1 Through 51,               Trial Date:     May 19, 2008
17
                Defendants.
18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                                    Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1

# **TABLE OF CONTENTS**

2

**Page**

3    I.    INTRODUCTION .................................................................................................1

4    II.    STATEMENT OF RELEVANT FACTS ...............................................................2

5        A.    ARAMARK Sports, LLC ..........................................................................2

6        B.    Plaintiff's Employment with ARAMARK ................................................2

7        C.    September 6, 2005:  Plaintiff Lied On His Application For Employment
            With ARAMARK .......................................................................................3

8
         D.    Plaintiff Had a Consensual Relationship With Defendant McVicker ..................3
9
         E.    Plaintiff Erroneously Believed Defendants Lee and McVicker Were
10            Romantically Involved ................................................................................4

11        F.    February 17, 2006:  Plaintiff Refused To Cover a Last-Minute Banquet...............4

12        G.    Early-February 2006: The Alleged Family Meal "Harassment" ...........................6

13        H.    Late-February 2006: The Alleged Chicken Pot Pie "Harassment" ........................6

14        I.    February 21, 2006: Plaintiff Contacted the ARAMARK Employee Hotline .........7

15        J.    February 23, 2006: Plaintiff Contacted Assistant General Manager Phil Ip
            With His Concerns.......................................................................................8
16
         K.    February 27, 2006: ARAMARK Investigated Plaintiff's Allegations of
17            Sexual Harassment......................................................................................8

18        L.    Early-March 2006: The Alleged Fish Taco "Harassment".................................9

19        M.    Mid-March 2006: Plaintiff Allegedly Requested a Pay Raise................................9

20        N.    March 13, 2006: ARAMARK Management Met With Plaintiff To Discuss
            Plaintiff and McVicker Working on Different Shifts ...........................................10
21
         O.    March 17, 2006:  ARAMARK Management Again Met With Plaintiff To
22            Discuss a Shift Change ..............................................................................10

23        P.    March 30, 2006:  Foster Began a Leave Of Absence .............................................11

24        Q.    June 15, 2006:  Plaintiff Voluntarily Resigned His Position...................................11

25    III.    LEGAL ARGUMENT .........................................................................................11

26        A.    Plaintiff Cannot Establish A Cause Of Action For Constructive Discharge
            Because Plaintiff Cannot Prove That He Was Subjected To "Intolerable
27            Conditions" At The Time Of His Resignation ........................................11

28        B.    Plaintiff Cannot Establish Sexual Harassment .....................................13

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

1-SF/7649382.1                                i                        Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

**TABLE OF CONTENTS**
(continued)

                                                                                    **Page**

1. Plaintiff's Quid Pro Quo Sexual Harassment Claim Fails Because Plaintiff Admitted He Suffered No Unwelcome Demands for Sexual Favors ................................................................. 13

2. Plaintiff's Hostile Work Environment Claim Fails Because Plaintiff Cannot Prove That The Alleged Conduct Was Severe And Pervasive ................................................................. 14

C. Plaintiff's Failure To Prevent Harassment/Discrimination Claim Is Without Merit ................................................................. 15

    1. ARAMARK Reasonably Sought To Prevent Discrimination And Harassment ................................................................. 15

    2. Upon Learning of Plaintiff's Allegations, ARAMARK Immediately Conducted An Investigation ................................................................. 15

D. Plaintiff's Claim For Retaliation Fails As A Matter Of Law ................................................................. 16

    1. Plaintiff Did Not Suffer An Adverse Employment Action ................................................................. 16

    2. Plaintiff Cannot Establish Any Causal Connection Between Any Alleged Protected Activity And Any Alleged Adverse Employment Action ................................................................. 17

E. Plaintiff's Cause of Action For Intentional Infliction of Emotional Distress Fails ................................................................. 18

    1. Plaintiff's Intentional Infliction of Emotional Distress Claim Against Defendants Is Barred By The Workers' Compensation Exclusive Remedy Doctrine ................................................................. 18

    2. Even If Plaintiff's Claim Was Not Barred By Workers Compensation, Plaintiff Cannot Meet The Elements Needed For An Intentional Infliction of Emotional Distress Cause of Action ................................................................. 18

        a. Defendants' Conduct Was Not Extreme Or Outrageous ................................................................. 18

        b. Plaintiff Cannot Show That The Defendants' Alleged Misconduct Was The Proximate Cause Of His Emotional Distress ................................................................. 19

F. Plaintiff's Alleged Disability Claims ................................................................. 19

IV. SETTLEMENT POSTURE ................................................................. 20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

1-SF/7649382.1                              ii                    Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1

## TABLE OF AUTHORITIES

2
**Page**

3 **Cases**

4 *Aguilar v. Avis Rent A Car System, Inc.*
     (1999) 21 Cal.4th 121 ...............................................................14
5
6 *Braunling v. Countrywide Home Loans Inc.*
     (9th Cir. 2000) 220 F.3d 1154 ....................................................19

7 *Brown v. Kinney Shoe Corp.*
     (5th Cir. 2001) 237 F.3d 556 .......................................................12
8
9 *Casenas v. Fujisawa USA*
     (1997) 58 Cal.App.4th 101 ..........................................................12

10 *Cloud v. Casey*
     (1999) 76 Cal.App.4th 895 ..........................................................12
11
12 *Cochran v. Cochran*
     (1998) 65 Cal.App.4th 488 ..........................................................19

13 *Fermino v. Fedco, Inc.*
     (1994) 7 Cal.4th 701 ....................................................................18
14
15 *Fisher v. San Pedro Peninsula Hosp.*
     (1989) 214 Cal.App.3d 590 .........................................................19

16 *Flait v. North American Watch Co.*
     (1992) 3 Cal.App.4th 467 ......................................................16, 17
17
18 *Huebschen v. Department of Health and Social Services*
     (7th Cir. 1983) 716 F.2d 1167 .....................................................15

19 *Jordan v. Clark*
     (9th Cir. 1988) 847 F.2d 1368 .....................................................17
20
21 *Livitsanos v. Superior Court*
     (1992) 2 Cal.4th 744 ....................................................................18

22 *Morris v. Oldham County Fiscal Court*
     (6th Cir. 2000) 201 F.3d 784 .......................................................14
23
24 *Potter v. Firestone Tire & Rubber Co.*
     (1993) 6 Cal.4th 965 ....................................................................18

25 *Sheffield v. Los Angeles County Department of Social Services*
     (2003) 109 Cal.App.4th 153 ........................................................13
26
27 *Shoemaker v. Myers*
     (1990) 52 Cal.3d 1 .......................................................................18
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

1-SF/7649382.1                          iii                  Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Succar v. Dade County School Board*
  (11th Cir. 2000) 229 F.3d 1343 ................................................................................ 14

*Trujillo v. North County Transit Dist.*
  (1998) 63 Cal.App.4th 280 ...................................................................................... 16

*Turner v. Anheuser-Busch, Inc.*
  (1994) 7 Cal.4th 1238 ............................................................................................. 12

*Yurick v. Sup. Ct.*
  (1989) 209 Cal.App.3d 1116 .................................................................................. 19

**Statutes**

California Evidence Code
  §1119(b)..................................................................................................................... 1

California Government Code
  §12940(h).................................................................................................................. 16

California Government Code
  §12940(k).................................................................................................................. 15

California Labor Code
  §3600(a) .................................................................................................................... 18

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

I-SF/7649382.1                               iv                    Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

## I.  **INTRODUCTION**

Defendants ARAMARK Sports, LLC ("ARAMARK"), Ying Kee McVicker ("McVicker"), and Matthew Lee ("Lee") (collectively "Defendants") submit this mediation brief in connection with the mediation scheduled for January 11, 2008 through the Bar Association of San Francisco's Early Settlement Program. Although Defendants are submitting this brief to Plaintiff Mark Foster ("Foster" or "Plaintiff") in advance of the mediation date, this brief and the information contained herein (and the exhibits attached hereto) are subject to the "mediation privilege" set forth in Evidence Code Section 1119(b) and shall not be admissible in any civil or administrative action or subject to discovery or disclosure.

Defendants did not discriminate, harass or retaliate against Plaintiff Foster. Based upon the undisputed evidentiary record in this case, Plaintiff does not have a claim as a matter of law and Defendants are confident that the motion for summary judgment they intend to file within the next 2 weeks will be granted in full by the Court.

The facts in this case are fairly straightforward. Plaintiff had a romantic relationship with Defendant Ying Kee McVicker. McVicker broke up with Plaintiff in early February 2006. Plaintiff was devastated by the break up, so much so that he began seeking mental health treatment. Soon after the break-up, Plaintiff claimed that McVicker and her supervisor, Defendant Matthew Lee, harassed and retaliated against him.

ARAMARK began an investigation less than one week after Plaintiff first complained of alleged harassment by McVicker and Lee. The investigation revealed that Plaintiff was upset about the break-up of his romantic relationship with McVicker, but that there was no evidence to support Plaintiff's claims of harassment/retaliation. Soon after Plaintiff's last conversation with ARAMARK management regarding the issue, Plaintiff requested and was granted a leave of absence. ARAMARK contacted Plaintiff shortly before the expiration of his leave to inquire about his return to work. Plaintiff never responded to ARAMARK and thus effectively resigned in June 2006. In total, Plaintiff was employed by ARAMARK for approximately 9 months and, during that period, was actively working for only approximately 6 months.

Since his brief employment ended, Plaintiff has filled his time by filing a number of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                                    1                        Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1 | claims against ARAMARK. In addition to this lawsuit, Plaintiff filed a claim for unpaid wages

2 | with the California Labor Commissioner, which was settled. He filed a claim for workers'

3 | compensation benefits, which was settled. He filed a claim for unemployment insurance benefits

4 | which ARAMARK, by electing not to appear at the appeal hearing, ultimately did not challenge.

5 | In addition to these claims, since his termination from ARAMARK, Plaintiff has also filed

6 | multiple state and federal court lawsuits against his former housing provider.

7 | Defendants are willing to negotiate in good faith at the mediation, however, that

8 | willingness is tempered by a reluctance to submit once again to Plaintiff's abusive tactic of using

9 | frivolous lawsuits as leverage to extract monetary settlements. Defendants strongly believe that

10 | given the undisputed facts they can demonstrate to the Court that Plaintiff's allegations are

11 | founded on nothing more than his hurt feelings following his break-up with McVicker and will be

12 | able to obtain summary judgment as to all of Plaintiff's claims.

13 | **II.    STATEMENT OF RELEVANT FACTS**

14 | **A.    ARAMARK Sports, LLC**

15 | ARAMARK Sports, LLC (hereinafter "ARAMARK") provides concessions, event

16 | planning, specialty dining, cafés, retail merchandise and novelty sales, and recreational and

17 | lodging services. One of their operations is the Carnelian Room Restaurant, located in the Bank

18 | of America building in downtown San Francisco.

19 | **B.    Plaintiff's Employment with ARAMARK**

20 | Plaintiff was employed as Banquet Cook at the Carnelian Room. Plaintiff began his

21 | employment in September 2005, earning $15.50/hour and working between four and six days per

22 | week. Although his scheduled varied, he generally worked 6:30 a.m. to 2:30 p.m.

23 | As Banquet Cook, Plaintiff's responsibilities included preparing food in-house at the

24 | Carnelian Room, as well as cooking for the Wharton School of Business ("Wharton"), which was

25 | located off-site and with whom ARAMARK had a long-standing contract. Up until early March

26 | 2006, Plaintiff reported directly to Ying Kee McVicker, the a.m. Sous Chef. McVicker in turn

27 | reported to Matthew Lee, the Chef de Cuisine.

28 | Throughout his employment with ARAMARK, Plaintiff's employment was subject to the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                                   2                          Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1   terms and conditions of a Collective Bargaining Agreement (the "CBA") between the Restaurant

2   and Hotel Employees Union, Local 2 and ARAMARK. A true and correct copy of the effective

3   CBA is attached hereto as **Exhibit 1**.

4       **C.**    **September 6, 2005: Plaintiff Lied On His Application For Employment With**

5              **ARAMARK**

6       Plaintiff completed and submitted his Application for Employment to ARAMARK on

7   September 6, 2005, which included the following statement:

8             I hereby certify that all statements made in this application are true
              and correct to the best of my knowledge and belief. I understand

9             and agree that any misrepresentation or omission of facts in my
              application may be justification for refusal to hire, or termination

10           of employment.

11  On the Application for Employment, Plaintiff checked the "No" box after the question "Have you

12  ever been convicted of a felony?"[1] That was a lie. Three years prior to submitting his

13  Application for Employment, he had been convicted in federal court of the felony crime of aiding

14  and abetting mail fraud, an offense for which he was sentenced to 18 months in federal prison,

15  was . Deposition of Mark Foster, Volume I ("Depo. Vol. I") 13:20-25; 14:1-10. ARAMARK did

16  not learn of Plaintiff's misrepresentation until *after* discovery commenced in the present case.

17      **D.**    **Plaintiff Had a Consensual Relationship With Defendant McVicker**

18       In approximately December 2004, prior to his employment with ARAMARK, Plaintiff

19  entered into a consensual romantic relationship with McVicker. Plaintiff and McVicker did not

20  live together, nor were they married or engaged to be married. Plaintiff and McVicker concealed

21  their relationship from ARAMARK. Indeed, the Company first learned of the relationship only

22  after the relationship had ended when Plaintiff made a complaint about McVicker, as discussed

23  *infra*.

24       In February 2006, McVicker ended the relationship with Plaintiff, informing Plaintiff that

25  they "should just be friends" and that "she just wants to work together with [Plaintiff]." Depo.

26  Vol. II 121:1-4. Immediately after McVicker ended the relationship with Plaintiff, he began

27  harassing McVicker via text message, sending at least nine text messages over the course of four

---

[1] A true and correct copy of Plaintiff's employment application is attached hereto as **Exhibit 2**.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

1-SF/7649382.1              3               Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1    days and informing McVicker that "[your] attitude and behavior is fucked up" and that "[you]

2    doesn't know anything about respect or love."[2]  Plaintiff admitted that following the break-up

3    with McVicker he called her friends crying and begging that they talk to McVicker about the

4    break-up. Depo. Vol. II, 124:4-9; 269:14-16.

5        Plaintiff testified at deposition that following the break-up with McVicker, he was

6    "devastated," "very hurt," and "very, very upset," which resulted in him experiencing difficulty

7    eating and sleeping and interfered with his performance at work.. Depo. Vol. II, 119:7-23; 126:6-

8    11; 269:14-16.  Plaintiff also testified that he was *angry* toward McVicker following their break-

9    up, which affected how he interacted with her at work. Depo. Vol. II, 130:15-22.

10   **E.    Plaintiff Erroneously Believed Defendants Lee and McVicker Were**
         **Romantically Involved**

11

12        Plaintiff has claimed that following the break-up of his relationship with McVicker, he

13   had "an intuition" or a "feeling" that McVicker and Lee were romantically involved, an allegation

14   that both Lee and McVicker have expressly denied and for which there is no foundation

15   whatsoever. Depo. Vol. II.,142:11-12.  Plaintiff admitted at deposition that neither McVicker,

16   Lee, nor anyone else ever told him that McVicker and Lee were in a romantic relationship, and he

17   did not ever see McVicker or Lee hugging, kissing, or holding hands at work. Depo. Vol. II.,

18   137:1-12.  Plaintiff states that this "feeling" regarding Lee's and McVicker's alleged relationship

19   was based on nothing more than witnessing McVicker and Lee talking and standing close

20   together in the kitchen of the Carnelian Room. Depo. Vol. II, 143:1-5.

21   **F.    February 17, 2006:  Plaintiff Refused To Cover a Last-Minute Banquet**

22        On or around the week of February 13, 2006, ARAMARK received last-minute notice of

23   a banquet job, a common occurrence at ARAMARK, to occur on February 18, 2006.[3]  Due to the

---

24   [2] A true and correct copy of Plaintiff's demeaning, threatening and caustic text messages to McVicker during this
     period is attached hereto as **Exhibit 3**.

25   [3] At deposition, Plaintiff stated the following:
     Q:  Given the experience you had working at ARAMARK, was it your experience that sometimes banquets and
26       things like that can be scheduled on short notice?
     A:  Sure, banquets can be scheduled on short notice.
27   Q:  And that the coordination was sometimes fluid in terms of changes and who can cover what; is that your
         experience?
28   A:  Sure.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                                4                    Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1 | short notice of the event, Plaintiff, who was scheduled to be off of work that week for four days in

2 | a row (including February 18), was assigned to assist in covering the banquet. Defendant

3 | Matthew Lee was responsible for scheduling Plaintiff's shifts at that time and made a change to

4 | the posted schedule immediately after learning about the banquet, indicating that Plaintiff would

5 | now need to report to work on February 18.

6 | Shortly after Lee made the change to Plaintiff's schedule, Plaintiff approached McVicker,

7 | who had no role in changing Plaintiff's schedule, requesting that she tell Lee that Plaintiff would

8 | be unable to work on February 18 because he "had plans." When Lee questioned Plaintiff about

9 | his refusal to cover the scheduled shift, Plaintiff offered no further explanation.[4] Despite the fact

10 | that Plaintiff, who at his own admission was hired as a full-time employee to work between four

11 | to six shifts per week, was working only three shifts the week of February 13, Plaintiff told Lee

12 | that he would not cover the banquet.

13 | Plaintiff testified at deposition that the reason he refused to cover the shift was not

14 | actually because he had plans, but because Lee did not personally ask Plaintiff to work on

15 | February 18:

16 |         Q:    Are you saying that if Mr. Lee had asked you if it was okay
17 |         to schedule you for Saturday before he actually changed the
   |         schedule, then you would have been okay with that and worked the
18 |         Saturday?

19 |         A.:    [Y]es, I possibly would have said yes. Maybe I – even
   |         though I may have – even though I made plans, there was a
20 |         possibility I would have been willing to change my plans.

21 | Depo. Vol. I, 89:1-9.

22 | Following Plaintiff's refusal to cover the banquet, Lee drafted a written warning for

23 | Plaintiff's refusal to cover the February 18 shift. After Plaintiff discussed this warning with Lee's

24 | supervisor, Assistant Manager Phil Ip, Mr. Ip told Plaintiff that the written warning Lee had

25 | drafted would be withdrawn and would not go into Plaintiff's file. ARAMARK has no copy of

26 | this warning – it does not exist in Plaintiff's personnel file or any other file in ARAMARK's

27 | Depo. Vol. I, 96:10-19.
   | [4] Plaintiff admitted at deposition that his "plans" did not include any out-of-pocket expense that would have resulted
   | in Plaintiff losing money had he actually worked on February 18, i.e., airplane tickets, train tickets, event tickets,
28 | hotel reservations. Depo. Vol. I, 85:19-25; 86:1-15.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1            5            Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1    possession.[5] Plaintiff apparently had saved a copy of the warning and produced it during

2    discovery in this case.

3    **G.    Early-February 2006: The Alleged Family Meal "Harassment"**

4        It is the practice at ARAMARK that each day a "family meal" is prepared for staff

5    members. According to Plaintiff, enough food is prepared to serve between forty and fifty

6    people. Depo. Vol. II, 158:20-22. During Plaintiff's employment with ARAMARK, the

7    responsibility for the "family meal" was shared by various employees, including both McVicker

8    and Plaintiff. Depo. Vol. II, 157:18-20. Oftentimes, McVicker would prepare the meal if

9    Plaintiff was late for work or had not initiated the process by around 8:00 a.m.

10        Plaintiff has claimed that on one occasion in early February, he prepared two roast beefs

11   for the "family meal" and thereafter learned that McVicker had that same day prepared fried

12   chicken, which Plaintiff assumed to be for the "family meal." Depo. Vol. II, 159:1-4. Plaintiff

13   claims that this constituted "harassment".

14        Plaintiff has admitted that he did not ask McVicker why she cooked the fried chicken or

15   whether it was for the family meal, nor did he inform McVicker that he had cooked roast beef for

16   the "family meal," nor did he in any way attempt to resolve the misunderstanding regarding the

17   overlap in preparation of the "family meal" for that given day. Depo. Vol. II, 159: 5-7, 13-18;

18   160:8-25; 161:18-22; 162:18-24. Although Plaintiff did not serve the roast beef for that

19   morning's "family meal," Plaintiff admitted that he probably served the roast beef to the a.m.

20   shift the following day, obviating the need for Plaintiff to prepare the "family meal" that next day

21   and thus his time had not been wasted and no food was wasted or thrown-out as the result of the

22   alleged miscommunication between McVicker and Plaintiff. Depo. Vol. II, 161:23-25; 162:1-17.

23   **H.    Late-February 2006: The Alleged Chicken Pot Pie "Harassment"**

24        Plaintiff has claimed that at some point in late-February, he received an order from the

25   Wharton School for chicken pot pie, which required him to order and poach chicken. Depo. Vol.

26   II, 165:4-7. Plaintiff alleges that at some point after he ordered and poached the chicken for the

---

[5] In fact, Plaintiff testified at deposition that on February 27, 2006, Jerry D. McCarthy ("McCarthy"), who conducted ARAMARK's investigation of Plaintiff's allegations of harassment, confirmed for Plaintiff that no written reprimand existed in his file. Depo. Vol. I, 81:3-4.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

1-SF/7649382.1                           6                    Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1    Wharton order, another ARAMARK employee, Daniel Grimm ("Grimm") informed him that

2    McVicker wanted Plaintiff to know that there was poached chicken in the refrigerator which was

3    available to Plaintiff should he want to use it for the Wharton order. Depo. Vol. II, 165:8-10.

4    Plaintiff claims that this constituted "harassment".

5        Plaintiff admitted that he does not know who poached the chicken in the refrigerator,

6    when it had been poached, for what purpose it had been poached, or even when McVicker had

7    told Grimm that there was in fact poached chicken available – i.e., before or after Plaintiff had

8    poached his chicken. Depo. Vol. II, 167:3-25; 168:1-25; 169:1-3; 175:1-5. Plaintiff used the

9    poached chicken he had prepared for the Wharton order, which he had intended to do all along.

10   Depo. Vol. II, 169:8-12. As was the case with the extra roast beef prepared by Plaintiff for the

11   family meal, discussed in Section I.G, *supra*, the poached chicken in the refrigerator was likely

12   used for a later "family meal."

13   **I.    February 21, 2006: Plaintiff Contacted the ARAMARK Employee Hotline**

14       On February 21, 2006, Plaintiff called the ARAMARK Employee Hotline and reported

15   that his "workplace became hostile because Ying Kee McVicker broke off their relationship."

16   The ARAMARK Employee Hotline is a toll free telephone number that ARAMARK employees

17   may call to report any concerns about violations of ARAMARK conduct policies. Employees

18   may call the Hotline 24 hours per day, seven days per week. Plaintiff's February 21 call is the

19   *first time* that ARAMARK was made aware of Plaintiff's concerns regarding McVicker and Lee

20   (and also the first time that ARAMARK was made aware that Plaintiff and McVicker had had a

21   romantic relationship). A true and correct copy of the Hotline report is attached hereto as **Exhibit**

22   **4.**

23       Plaintiff stated during the call that he was "depressed and angry" over the break-up with

24   McVicker. He further stated that he and McVicker "do not communicate well" and that

25   McVicker is "involved with Lee." Plaintiff referenced the alleged incident involving Lee

26   changing Plaintiff's schedule, but stated that he "believes that Ying Kee is the cause for the entire

27   issue … and believes she should be moved to another location or reprimanded." Plaintiff made

28   no mention of any other alleged wrongdoers, nor did he identify any witnesses who may have

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                                7                    Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1    observed the alleged harassment by McVicker and Lee.[6]

2    **J.    February 23, 2006: Plaintiff Contacted Assistant General Manager Phil Ip**
     **With His Concerns**

3

4         On February 23, Plaintiff approached Assistant General Manager Phil Ip ("Ip") with two

5    type-written documents that Plaintiff had drafted, one describing the alleged incident involving

6    Lee changing Plaintiff's schedule and the other document detailing the change in his relationship

7    with McVicker since their break-up.  Ip responded appropriately by saying "[t]hank you for

8    making me aware of the problem" and informed Plaintiff that he would forward the documents to

9    ARAMARK's Human Resources Department in Philadelphia.  Depo. Vol. II, 216:23-25; 217:1-

10   4.

11   **K.    February 27, 2006: ARAMARK Investigated Plaintiff's Allegations of Sexual**
     **Harassment**

12

13        On February 27, less than one week after Plaintiff first informed ARAMARK via the

14   ARAMARK Employee Hotline of the alleged harassment by McVicker and Lee, and a mere four

15   days after Plaintiff first approached Ip regarding his complaints, Jerry D. McCarthy, a General

16   Manager for ARAMARK's Santa Clara Convention Center location, was brought in as a neutral

17   party to perform an investigation of Plaintiff's allegations.

18        McCarthy met with and interviewed Plaintiff to fully understand his allegations.

19   McCarthy approached Plaintiff's claims in a serious manner, ensuring Plaintiff that his

20   complaints were being taken seriously.  Upon concluding their meeting, McCarthy "gave

21   [Plaintiff] his card and said 'call me anytime.'"  Depo. Vol. II, 220:6-9.  McCarthy then also met

22   with and interviewed McVicker, Lee, and Ip.

23        As a result of these interviews, McCarthy concluded that there were no facts or evidence

24   supporting Plaintiff's claims of harassment.  On or around March 6, 2006, McCarthy attempted to

25   contact Foster to relay his findings, but Foster did not answer his phone.  McCarthy then left

26   _____

27   [6] Plaintiff claims he made a second call to the ARAMARK Employee Hotline at some point following the February
     21 call.  ARAMARK keeps records of all such calls and has no record of any alleged second call from Foster, nor has
     Plaintiff been able to produce any documentation evidencing his alleged second call to the ARAMARK Employee
28   Hotline.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                          8                      Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1    Foster a voicemail detailing his findings.

2    **L.    Early-March 2006: The Alleged Fish Taco "Harassment"**

3    As part of Plaintiff's employment with ARAMARK, he was responsible for assisting in

4    the preparation of the meals for the Wharton account.  Approximately three times a week, the

5    Director of Operations for the Wharton Account, Elizabeth Stone ("Stone") would come to the

6    Carnelian Room to pick up the food that had been prepared for Wharton, making sure the order

7    was correct and that the food had been properly prepared.

8    Plaintiff has claimed that in early-March, he had to prepare fish tacos for the Wharton

9    account.  At some point after be began preparing the fish tacos, Plaintiff realized that he did not

10   have enough fish to complete the order.  Depo. Vol. II, 177:16-23.  Plaintiff approached the

11   acting Executive Chef, Alfonso Valledor ("Valledor"), indicating that he might be short on fish

12   for the Wharton order.  According to Plaintiff, Valledor "was supportive in providing [Plaintiff]

13   with a remedy ... he told [Plaintiff] that if [Plaintiff] came up short ... to let him know."  Depo.

14   Vol. II, 181:20-25.

15   Plaintiff then prepared the fish tacos, and the tacos were picked up by Stone as planned.

16   Shortly thereafter, Stone told Plaintiff that Wharton needed more fish tacos.  Depo. Vol. II, 183:2-

17   3.  After Plaintiff learned that he would need to prepare more tacos, a co-worker, Daniel Grimm,

18   approached Plaintiff with a bag of fish, stating that it was from McVicker, who had by this point

19   learned that Plaintiff needed more fish.  Depo. Vol. II, 185:1-7.  Plaintiff then prepared the

20   remaining fish tacos with the bag of fish that McVicker supplied, and Stone came back to pick up

21   the order.  Depo. Vol. II, 186:19-21  When Stone arrived, McVicker informed Stone that she had

22   inadvertently used some of the fish to be used for Plaintiff's first batch of fish tacos, which had

23   been in an unmarked bag in the freezer.  Depo. Vol. II, 179:23-25; 180:1; 279:13-20.  Plaintiff

24   informed McVicker that she "should have at least told me" she was taking the fish and claims that

25   this constituted "harassment".  Depo. Vol. II, 180:2-3.

26   **M.    Mid-March 2006: Plaintiff Allegedly Requested a Pay Raise**

27   Plaintiff has alleged that in mid-March, *only six months after he was hired*, he approached

28   Executive Chef Tim Miller ("Miller") and Senior Executive Chef Jesus Cibrian ("Cibrian") to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                                  9                       Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1   request a raise in pay. Plaintiff claims Miller told him that they would have to discuss the issue

2   later. Depo. Vol. II, 195:8-15. In fact, Plaintiff's employment was governed by the CBA

3   between ARAMARK and the Restaurant and Hotel Workers Union, Local 2, which determined

4   the timing and amount of all pay raises for employees in Plaintiff's position. *However, there*

5   *were no raises being given under the contract and Plaintiff was simply not entitled to a raise*

6   *under the contract.* In addition, Plaintiff went out on a leave of absence shortly after this

7   conversation, before ARAMARK could even respond to him about his request.

8   **N.    March 13, 2006: ARAMARK Management Met With Plaintiff To Discuss
         Plaintiff and McVicker Working on Different Shifts**
9

10          On March 13, chefs Miller and Valledor met with Plaintiff and McVicker to discuss either

11   Plaintiff or McVicker working on the p.m. shift, so that they no longer had to work together.

12   During the meeting, Miller informed Plaintiff and McVicker that the issue of whether they should

13   be working together in the future was being taken very seriously, though scheduling would need

14   to be done based on the needs of the kitchen. Miller further informed Plaintiff and McVicker that

15   he needed authority from Cibrian, the Senior Executive Chef, about how to handle the situation,

16   but that he would try to have an answer regarding a potential move by the end of the week, which

17   Plaintiff admitted seemed fair. Depo. Vol. II, 231:10-12. Miller specifically presented Plaintiff

18   with the option of working the p.m. shift, but Plaintiff was resistant to this change.

19   **O.    March 17, 2006: ARAMARK Management Again Met With Plaintiff To
         Discuss a Shift Change**
20

21          On March 17, Plaintiff again met with ARAMARK management – this time with Miller

22   as well as Cibrian. Miller told Plaintiff that the Company was considering different shifts for him

23   and McVicker, but wanted to find a mutually agreeable solution (and, thus far, neither McVicker

24   nor Plaintiff wanted to change his/her shift). Miller also told Plaintiff that regardless of any shift

25   change, McVicker would no longer be supervising Plaintiff. Depo. Vol. II, 234:16-17. *Effective*

26   *as of that meeting, Miller supervised Plaintiff, and Plaintiff reported directly to Miller, not*

27   *McVicker.* Depo. Vol. II, 245:17-20.

28          Following the March 17 meeting until Plaintiff's began his leave of absence on March 30,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1    McVicker and Plaintiff worked together on *only two shifts*.

2    **P.    March 30, 2006: Foster Began a Leave Of Absence**

3    In mid-March 2006, Plaintiff approached both Human Resources Manager James Chan

4    ("Chan") and chef Tim Miller to discuss the possibility of taking a leave of absence due to

5    emotional problems. Plaintiff did not mention any alleged harassment by McVicker and Lee.

6    Miller informed Plaintiff that he was entitled to such a leave of absence.

7    On March 28, Plaintiff signed a Leave of Absence Request Form requesting a leave of

8    absence for "emotional stress and mental anguish" from March 30, 2006, to return no later than

9    June 15, 2006. The request contained the following language: "I understand that failure to report

10   to work at the date specified above means that I am quitting voluntarily and I will, therefore, be

11   terminated on that date." The date specified was June 15, 2006. The request was approved on

12   March 28. Plaintiff was notified that request had been approved on March 29 and began his leave

13   of absence on March 30. A true and correct copy of Plaintiff's request for leave is attached hereto

14   as **Exhibit 5**.

15   **Q.    June 15, 2006: Plaintiff Voluntarily Resigned His Position**

16   On June 12, 2006, Miller called Plaintiff to remind Plaintiff that he was scheduled to

17   return to work on June 15. Plaintiff admittedly never returned Miller's call. Depo. Vol. II,

18   302:21-22. When Plaintiff failed to return to work on June 15, 2006, he effectively resigned his

19   position, and his employment with ARAMARK ended that same date. Plaintiff later confirmed

20   his resignation in a signed writing, a true and correct copy of which is attached hereto as **Exhibit**

21   **6**.

22   **III.    LEGAL ARGUMENT**

23   **A.    Plaintiff Cannot Establish A Cause Of Action For Constructive Discharge**
         **Because Plaintiff Cannot Prove That He Was Subjected To "Intolerable**
24       **Conditions" At The Time Of His Resignation**

25   To establish constructive discharge, Plaintiff must establish that Defendants "either

26   intentionally created or knowingly permitted working conditions that were so intolerable or

27   aggravated at the time of the employee's resignation … that a reasonable person in the

28   employee's position would be compelled to resign." *Turner v. Anheuser-Busch, Inc.* (1994) 7

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                              11                        Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1    Cal.4th 1238, 1246. An employee may not be unreasonably sensitive to his or her working

2    environment – "employees are not guaranteed a work environment free of stress and the

3    frustrations, challenges and disappointments inherent in any employment." *Id.* at 1247.

4    Following Turner, courts have closely scrutinized "constructive discharge" claims. *See Cloud v.*

5    *Casey* (1999) 76 Cal.App.4th 895, 904-5 (granting summary judgment on constructive discharge

6    claim even though plaintiff was the victim of sex discrimination; court held the working

7    conditions were not so intolerable that plaintiff was compelled to resign); *Casenas v. Fujisawa*

8    *USA* (1997) 58 Cal.App.4th 101, 117 (no constructive discharge where, among other things, the

9    employee objected to her supervisor's communication and management style, which included

10    "derogatory comments" and condescending criticism).

11       The "intolerable" working conditions necessary to prove constructive discharge are a

12    higher standard for Plaintiff to meet than the "abusive working environment" required for a

13    harassment claim. *Brown v. Kinney Shoe Corp.* (5th Cir. 2001) 237 F.3d 556, 566. The

14    conditions giving rise to the resignation must be "sufficiently extraordinary and egregious to

15    overcome the normal motivation of a competent, diligent, and reasonable employee to remain on

16    the job to earn a livelihood and to serve his or her employer." *Turner,* 7 Cal.4th at 1246. The

17    proper focus is on whether the resignation was coerced, not whether it was simply one rational

18    option for the employee. *Id.*

19       Here, Plaintiff cannot prove that a "reasonable person" in his position would have been

20    compelled to resign from ARAMARK. While Plaintiff alleges that he was harassed and retaliated

21    against by Lee and McVicker, the incidents identified by Plaintiff both in his Complaint and at

22    deposition at worst involve miscommunications between Plaintiff and McVicker regarding their

23    work duties in the kitchen – none of which had any negative or detrimental consequences.

24    Plaintiff has alleged only one direct confrontation – with Defendant Matthew Lee – regarding

25    Plaintiff's refusal to work his scheduled shift, which Plaintiff acknowledges resulted in no

26    discipline or other adverse employment actions. Moreover, shortly after the alleged incident with

27    Lee, Miller took over responsibility for scheduling Plaintiff's shifts, and because Lee and Plaintiff

28    were on opposite schedules, Plaintiff had virtually no interaction with Lee, except for an hour or

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1      12      Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1 two overlap in shifts, from late February until Plaintiff began his leave of absence on March 30.

2      Plaintiff's "constructive discharge" claim fails for the additional reason that ARAMARK

3 immediately addressed his concerns regarding McVicker's and Lee's alleged harassing behavior.

4 Less than one week after Plaintiff's call to the ARAMARK Employee Hotline on February 21,

5 ARAMARK commenced an investigation of Plaintiff's allegations, conducted by a neutral party

6 who was not employed at the Carnelian Room location. McCarthy encouraged Plaintiff to

7 contact him at any time and promptly notified Plaintiff following the investigation to inform him

8 of his findings. Following the investigation, management had several discussions with Plaintiff

9 and McVicker about working on different shifts. As of March 17, Plaintiff was *no longer*

10 *reporting to McVicker* and, in fact, he was scheduled on *only two shifts with McVicker* from that

11 point until his leave of absence commenced on March 30. Thus, in the weeks prior to his leave of

12 absence, he had virtually no contact with either Lee or McVicker.

13      Finally, Plaintiff suffered no tangible changes in the conditions of his employment at any

14 time throughout his tenure at ARAMARK – he admitted in his deposition that during his

15 employment with ARAMARK, his rate of pay, position as Banquet Cook, benefits, and hours of

16 employment **always remained the same**. Depo. Vol. I, 45:9-25; 46:1-6; 50:11-25; 51:1-6.

17      Plaintiff offers no evidence of any "sufficiently extraordinary and egregious" conditions

18 which would compel a reasonable person in his circumstances to resign on June 15, 2006, after he

19 had been away from ARAMARK, McVicker, and Lee for almost three months.

20     **B.**   **Plaintiff Cannot Establish Sexual Harassment**

21         1.   <u>Plaintiff's Quid Pro Quo Sexual Harassment Claim Fails Because Plaintiff</u>
<u>Admitted He Suffered No Unwelcome Demands for Sexual Favors</u>

22

23      Plaintiff claims that he has suffered quid pro quo sexual harassment which, under the

24 FEHA, consists of unwelcome demands for sexual favors in return for advancement or other

25 perquisites in the workplace. *Sheffield v. Los Angeles County Department of Social Services*

26 (2003) 109 Cal.App.4th 153. However, in his Complaint, Plaintiff does not allege that Defendant

27 McVicker made unwanted sexual advances towards him at any point or conditioned his

28 advancement or other employment benefits upon continuing their relationship. Plaintiff has

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1           13           Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1   acknowledged that it was McVicker who decided to end their relationship.  Plaintiff alleges that

2   McVicker then ignored him after their relationship ended.

3         In his deposition, Plaintiff admitted that there was no inappropriate touching between he

4   and McVicker after their relationship ended, nor did McVicker use any sexual language at work,

5   communicate to him at any time that she wanted to get back together, make any sexual gestures

6   toward him, attempt to engage in any type of sexual conduct, or indicate at any time that if he

7   engaged in further sexual conduct she would advance his position in nay way.  Depo. Vol. II,

8   222:9-25; 223:1-15.  Plaintiff has absolutely no basis for claiming quid pro quo sexual

9   harassment.

10         2.   <u>Plaintiff's Hostile Work Environment Claim Fails Because Plaintiff Cannot
               Prove That The Alleged Conduct Was Severe And Pervasive</u>

11

12         Plaintiff alleges that Defendants created a hostile work environment.  To prevail on such

13   claim, Plaintiff must demonstrate that the conduct complained of was sufficiently severe or

14   pervasive to alter the conditions of employment and create a work environment that was hostile or

15   abusive to him because of his sex.  *See Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th

16   121.

17         As discussed above, the incidents identified by Plaintiff as harassing behavior on the part

18   of McVicker involved, at worst, nothing more than miscommunication between Plaintiff and

19   McVicker regarding their work duties in the kitchen.  Moreover, even if McVicker had expressed

20   anger or hostility toward Plaintiff as a result of their break-up – of which there is no evidence –

21   hostile words or conduct based solely on personal animosity, even if the parties were at one time

22   in a sexual relationship with each other, is not actionable as sexual harassment: "Unfair,

23   overbearing, or annoying treatment of an employee, standing alone, cannot constitute a sex

24   discrimination claim."  *Morris v. Oldham County Fiscal Court* (6th Cir. 2000) 201 F.3d 784, 790

25   (supervisor became belligerent following plaintiff's complaints to employer, but his conduct was

26   not actionable as sexual harassment).  Courts have established that an ex-lover seeking retribution

27   or acting coldly is not sexual harassment.  *Succar v. Dade County School Board* (11th Cir. 2000)

28   229 F.3d 1343, 1345 (female employee's alleged harassment of male employee who broke off

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1  their romance was not sexual harassment because it was based on anger, not gender). *Huebschen*

2  *v. Department of Health and Social Services* (7th Cir. 1983) 716 F.2d 1167, 1172 (supervisor's

3  alleged disparate treatment of plaintiff based on the animosity created by termination of their

4  relationship is not actionable harassment because Plaintiff's gender is merely coincidental to the

5  conduct).

6      As for Defendant Lee's alleged harassing behavior, Plaintiff has identified only one

7  incident involving Lee – scheduling Plaintiff to work a last-minute banquet and reprimanding

8  Plaintiff for his refusal to do so – which resulted in no detriment to Plaintiff, as the written

9  warning drafted by Lee was withdrawn by the Assistant General Manager Mr. Ip.  Plaintiff did

10 not even work on the same shift as Lee and, in fact, stated in his call to the ARAMARK Hotline

11 that "Ying Kee is the cause for the entire issue."  Plaintiff has presented no evidence that Lee

12 engaged in harassing behavior, most certainly not harassing behavior based on Plaintiff's sex.

13 **C.    Plaintiff's Failure To Prevent Harassment/Discrimination Claim Is Without Merit.**

14

15     The FEHA requires employers to take all reasonable steps necessary to prevent

16 discrimination and harassment from occurring. Cal. Govt. Code § 12940(k).

17     1.    <u>ARAMARK Reasonably Sought To Prevent Discrimination And Harassment</u>

18

19     At all relevant times, ARAMARK had a Zero Tolerance Policy against harassment,

20 discrimination, and retaliation in the workplace, and procedures for employees to file a complaint,

21 including a toll-free hotline which permitted anonymous complaints.  In fact, Plaintiff himself

22 signed an acknowledgment forms at the commencement of his employment, certifying that he had

23 read and understood Sexual Harassment policy.  By adopting these policies and procedures,

24 ARAMARK took reasonable steps to prevent discrimination and harassment in its workplace.

25     2.    <u>Upon Learning of Plaintiff's Allegations, ARAMARK Immediately Conducted An Investigation</u>

26

27     As stated above, less than one week after Plaintiff's call to the ARAMARK Employee

28 Hotline on February 21, ARAMARK commenced an investigation of Plaintiff's allegations,

1    conducted by Jerry McCarthy, a neutral party who was not employed at ARAMARK's Carnelian

2    Room location. McCarthy conducted lengthy interviews with not only Plaintiff, but Lee,

3    McVicker, and Ip. After reviewing all of the information provided by the relevant parties,

4    McCarthy concluded that Plaintiff's claims of unlawful conduct against Lee and McVicker could

5    not be substantiated. Following his investigation, McCarthy communicated with Plaintiff

6    regarding Plaintiff's allegations and the status of the investigation, following-up with Plaintiff

7    regarding the outcome of the investigation.

8    　　　　Because Defendants will prevail on Plaintiff's underlying harassment claims, they will

9    prevail as to his claim for failure to prevent as well. *See Trujillo v. North County Transit Dist.*

10    (1998) 63 Cal.App.4th 280, 289 (no cause of action lies for failure to take steps necessary to

11    prevent discrimination or harassment if no such conduct in fact occurred).

12    　　**D.    Plaintiff's Claim For Retaliation Fails As A Matter Of Law**

13    　　　　The FEHA prohibits employers from retaliating against any person for opposing any

14    practice forbidden by the statute, or for filing a complaint, testifying, or assisting in any

15    proceeding under the statute. Cal. Govt. Code § 12940(h). To prove his claim of retaliation,

16    Plaintiff must show that (1) he engaged in a protected activity; (2) Defendants subjected him to

17    adverse employment action; and (3) there is a causal link between the two. *See Flait v. North*

18    *American Watch Co.* (1992) 3 Cal.App.4th 467, 475.

19    　　　　　　1.    Plaintiff Did Not Suffer An Adverse Employment Action

20    　　　　As discussed above in Section III.A., *supra*, Plaintiff did not suffer any adverse

21    employment action – he incurred no change in pay, position, status, or benefits at any point

22    throughout his employment with ARAMARK. Moreover, while Plaintiff alleges that he did not

23    receive a pay raise or promotion throughout his employment, he fails to acknowledge that his

24    employment was at all times covered by the CBA between Local Union 2 and ARAMARK,

25    which governed increases in pay and eligibility for promotions for employees in Plaintiff's

26    position.

27    　　　　Moreover, Plaintiff was employed with ARAMARK for <u>only six months</u> at the time he

28    went out on his leave of absence. Plaintiff never asked anyone at ARAMARK for a promotion,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                                16                          Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

and there were other employees in the kitchen at the time with more seniority than he had and who would have therefore been entitled to promotions in positions before Plaintiff. Depo. Vol. II., 203:6-8. Based on these facts, Plaintiff cannot establish that he suffered an adverse employment action.

2.    Plaintiff Cannot Establish Any Causal Connection Between Any Alleged
       Protected Activity And Any Alleged Adverse Employment Action

As part of his prima facie case of retaliation, Plaintiff must demonstrate a causal link between his alleged protected activity and the alleged adverse employment action. *See Flait, supra,* 3 Cal.App.4th at 475. The causal link may be established by an inference derived from circumstantial evidence, such as (1) Defendants' knowledge that Plaintiff had engaged in protected activity, or (2) the proximity in time between the alleged protected activity and the alleged retaliatory employment decision. *See Jordan v. Clark* (9th Cir. 1988) 847 F.2d 1368, 1376.

Here, Plaintiff cannot establish any causal connection between his alleged protected activity and any alleged adverse action taken against him. The majority of the alleged incidents of harassment and retaliation occurred *prior* to Plaintiff's February 21 ARAMARK Hotline call. Specifically, the alleged harassment involving Lee issuing Plaintiff a warning on or around February 17 took place one week *before* Plaintiff placed his call to the ARAMARK Hotline. Plaintiff's call to the ARAMARK Employee Hotline was the first time Defendant ARAMARK became aware that Plaintiff was allegedly being harassed by Lee and McVicker. Moreover, the incident in which Plaintiff and McVicker both prepared the "family meal" occurred, according to Plaintiff, in the first two weeks of February, also *prior* to Plaintiff's Hotline call. While the incident involving the poached chicken may have occurred after the Hotline Call, there is no evidence that McVicker was even aware of Plaintiff's Hotline call until McCarthy commenced his investigation on February 27. Because Plaintiff has no substantial evidence of an adverse action *subsequent to* any alleged protected activity, his retaliation claim is fatally flawed.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                              17                    Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

E.    **Plaintiff's Cause of Action For Intentional Infliction of Emotional Distress Fails**

    1.    Plaintiff's Intentional Infliction of Emotional Distress Claim Against Defendants Is Barred By The Workers' Compensation Exclusive Remedy Doctrine

Plaintiff's cause of action for intentional infliction of emotional distress claims that he has suffered and will continue to suffer extreme emotional distress as the result of Defendants' actions. California Labor Code Section 3600(a) provides that "subject to certain particular exceptions ... the workers' compensation liability 'in lieu of any other liability whatsoever' will exist 'against an employer for any injury sustained by his or her employees arising out of and in the course of employment.'" *Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 708; *Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 754; *see also Shoemaker v. Myers* (1990) 52 Cal.3d 1, 25 (disabling injuries, whether mental or physical, arising out of employment termination, are generally within realm of workers' compensation law and subject to its exclusive remedy provision).

On April 3, 2006, Plaintiff filed a workers' compensation claim regarding his emotional stress in the workplace. By filing a workers' compensation claim, Plaintiff has conceded that his civil claim should be preempted.

    2.    Even If Plaintiff's Claim Was Not Barred By Workers Compensation, Plaintiff Cannot Meet The Elements Needed For An Intentional Infliction of Emotional Distress Cause of Action

Plaintiff also fails to meet the basic elements of an intentional infliction of emotional distress claim. Those elements include the following: (1) extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress. *See Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001.

    a.    Defendants' Conduct Was Not Extreme Or Outrageous

For the reasons discussed above, Plaintiff cannot even establish the first element of the test, extreme and outrageous conduct. Conduct is considered extreme and outrageous when it "exceeds all bounds of decency usually tolerated by a decent society, and is of a nature which is especially calculated to cause, and does cause, mental distress. ... *Liability does not extend to*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                                    18                          Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1    *mere insults, threats, annoyances, petty oppressions, or other trivialities." Fisher v. San Pedro*

2    *Peninsula Hosp.* (1989) 214 Cal.App.3d 590, 618; *see also Yurick v. Sup. Ct.* (1989) 209

3    Cal.App.3d 1116, 1128-29; *Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 499. Even rude,

4    insensitive actions, such as yelling, screaming, threatening gestures and threats to terminate are

5    insufficient to support a cause of action for intentional infliction of emotional distress. *Braunling*

6    *v. Countrywide Home Loans Inc.* (9th Cir. 2000) 220 F.3d 1154, 1158, *citing Schneider v. TRW,*

7    *Inc.* (9th Cir. 1991) 938 F.2d 986, 992. Plaintiff has presented no evidence to support his

8    allegations that the alleged constructive discharge, harassment, retaliation, and failure to prevent

9    discrimination and harassment amounted to conduct that was "extreme or outrageous."

10            b.    <u>Plaintiff Cannot Show That The Defendants' Alleged Misconduct</u>

11                <u>Was The Proximate Cause Of His Emotional Distress</u>

12          Plaintiff began seeing psychiatrist Dr. Benjamin Barreras on or around March 3, 2006,

13    complaining of depression as the result of his break-up with McVicker. Dr. Barreras, who assessed

14    Plaintiff as "somewhat dramatic" with "the possibility of underlying ... histrionic personality

15    traits" details in his treatment notes numerous causes for Plaintiff's stress as identified by Plaintiff

16    himself which are totally unrelated to Defendants. These stressors included: a recurring threat of

17    eviction[7]; the discovery that someone was using his social security number; an arrest for

18    marijuana possession; and ongoing legal battles with his former housing provider which have

19    resulted in both state and federal lawsuits filed by Plaintiff in the past year. Plaintiff's treatment

20    with Barreras ended December 28, 2006.

21          Based on the evidence presented by Plaintiff's medical records, which indicate a host of

22    stressful events totally unrelated to Defendants, Plaintiff will be unable to prove that Defendants'

23    alleged conduct, to which he was subjected only until March 30 when he began his leave of

24    absence, was the cause of his ongoing emotional distress.

25    **F.    Plaintiff's Alleged Disability Claims**

26          In December 2007, Plaintiff filed a Motion for Leave to File Amended Complaint to add

27    _____

[7] Plaintiff was served at least two unlawful detainer actions – one on March 30, 2006 and one on July 5, 2006 – by Operation Dignity, his former housing provider. The first unlawful detainer action was served on the same day Plaintiff began his leave of absence from ARAMARK.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

1  causes of action against Defendants for disability discrimination, including alleged violations of

2  the ADA, FEHA, and the Unruh Civil Rights Act.  On December 19, Defendants entered into a

3  stipulation to allow Plaintiff leave to file his proposed amended complaint.  Plaintiff has not yet

4  filed his Amended Complaint.

5  　　While Defendants contend that Plaintiff's allegations of disability discrimination have no

6  merit, they have yet to conduct any discovery pertaining to the allegations and cannot

7  substantively comment on the allegations at this time other than to state that, for the reasons

8  expressed above, those claims are without merit.

9  **IV.    SETTLEMENT POSTURE**

10

11

12

13

14  # REDACTED

15

16

17

18

19  　　To date, Plaintiff has alleged over $20,000,000 in damages in this case, including over

20  $200,000 in economic damages, despite the fact that Plaintiff has not obtained other employment

21  since his employment with ARAMARK ended and has provided no substantial explanation as to

22  why he remains unemployed.  If Plaintiff continues to remain unemployed, Defendants strongly

23  believe they will be able to demonstrate that Plaintiff has unreasonably failed to mitigate his

24  alleged damages.

25  　　Moreover, Plaintiff's claim for emotional distress damages is completely undercut by the

26  medical records Defendant has obtained which indicate that Plaintiff's emotional problems are

27  attributable to his break-up with McVicker, numerous threats of eviction, a prior criminal

28  conviction which involved a lengthy parole lasting until November 2006, and alleged identity

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                                20                          Case No. CGC-07-461178

1    theft. As the records from Plaintiff's therapist are replete with references to Plaintiff's litany of

2    non-ARAMARK related stressors, Defendant cannot comprehend how Plaintiff can blame

3    Defendants for his alleged "emotional distress".

4    Dated: January 4, 2008                     MORGAN, LEWIS & BOCKIUS LLP

5

6                                          By

7                                             Eric Meckley
                                             Attorney for Defendants
8                                            ARAMARK SPORTS, LLC (erroneously
                                             sued as ARAMARK Sports and
                                             Entertainment), YING KEE McVICKER,
9                                            and MATTHEW LEE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7649382.1                          21                     Case No. CGC-07-461178

DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

Exhibit 1

COLLECTIVE BARGAINING AGREEMENT

BETWEEN

DAVRE'S INC. RESTAURANT

AND

HOTEL EMPLOYEES AND RESTAURANT
EMPLOYEES UNION, LOCAL 2

EFFECTIVE SEPTEMBER 1, 1997 - AUGUST 31, 2002

# TABLE OF CONTENTS

| Section | Title | Page Number |
|---|---|---|
| 1 | Recognition and Rights | 1 |
| 2 | Definitions | 2 |
| 3 | Union Membership and Checkoff | 2 |
| 4 | Hiring | 3 |
| 5 | Buttons | 3 |
| 6 | Interviews | 4 |
| 7 | Delinquent Payment of Wages | 4 |
| 8 | No Discrimination | 4 |
| 9 | Individual Contracts | 5 |
| 10 | Picket Lines | 5 |
| 11 | Military Service | 5 |
| 12 | Discharge And Warnings | 5 |
| **13** | **Health & Welfare, Pension & Education Trusts** | |
| 13.1 | Health & Welfare Trust | 5 |
| 13.2 | Pension Trusts Funds | 6 |
| 13.3 | Actuarial Gains | 6 |
| 13.4 | Eligibility | 6 |
| 13.5 | Accelerated Eligibility | 6 |
| 13.6 | Contribution Rates | 6 |
| 13.7 | Contribution Rates: Pension Trusts | 7 |
| 13.8 | All Trust Binding | 7 |
| 13.9 | No Duplications | 7 |
| 13.10 | Posting of Monthly Reports | 7 |
| 13.11 | Liquidated Damages and Delinquencies | 7 |
| 13.12 | Employer Liability | 8 |
| 13.13 | Selection of Employer Trustee and Amendment of Trust Documents | 8 |
| 13.14 | Health & Welfare Fund Waiver | 9 |
| 13.15 | Legal Plan | 9 |
| 14 | Grievance Procedure | 9 |
| 15 | Promotions and Transfers | 12 |
| 16 | Posted Job Vacancies | 13 |
| 17 | Savings Clause | 13 |
| 18 | Payment of Salary | 13 |
| 19 | Overtime | 13 |
| 20 | Reporting Pay | 14 |
| 21 | Work Schedule | 14 |
| 22 | Shop Stewards | 14 |
| 23 | Bulletin Boards | 14 |
| 24 | Meals | 14 |
| 25 | Employee Eating Facilities | 15 |
| 26 | Dressing Rooms and Lockers | 15 |
| 27 | Days Off | 15 |
| 28 | Relieving and Assisting | 15 |
| 29 | Rest Periods | 15 |

| Section | Title | Page Number |
|---------|-------|-------------|
| 30 | Vacations............................................... | 16 |
| 31 | Sick Leave or Disability........................... | 16 |
| 32 | Holidays.................................................. | 17 |
| 33 | Seniority.................................................. | 18 |
| 34 | Deductions and Donations........................ | 19 |
| 35 | Employment Conditions............................ | 19 |
| 36 | Premium Pay........................................... | 19 |
| 37 | Equal Pay for Men and Women................. | 20 |
| 38 | Combination Jobs..................................... | 20 |
| 39 | Leave of Absence..................................... | 21 |
| 40 | Jury Duty................................................ | 21 |
| 41 | Funeral Leave.......................................... | 21 |
| 42 | Maternity Leave of Absence...................... | 21 |
| 43 | Students................................................... | 22 |
| 44 | Fast Foods............................................... | 22 |
| 45 | Personnel Files........................................ | 22 |
| 46 | Leave for Union Service............................ | 22 |
| 47 | Health and Safety..................................... | 22 |
| 48 | Automation.............................................. | 23 |
| 49 | Uniforms, Linen and Tool Allowance......... | 23 |
| 50 | Craft Rules.............................................. | 24 |
| 51 | Night Shift Premiums............................... | 27 |
| 52 | Definitions............................................... | 27 |
| 53 | Term of Agreement.................................. | 29 |

| Addendum | | Page Number |
|-----------|--|-------------|
| "A" | Classifications and Wages for Employees Hired by the Employer Prior to 9/1/84 or Employees Hired After 9/1/84 who Have at Least One (1) Year of Service With an Employer Covered by a Local 2 Contract................................. | 30 |
| "B" | Classifications and Wages for Employees Hired by the Employer After 9/1/84 Including Those Employees Who Have Not Worked One (1) Year of Service With an Employer Covered by a Local 2 Contract................................. | 35 |
| "C" | Training and Apprenticeship Program........... | 39 |
| "D" | Supplemental Vacation Benefit Plan............. | 41 |
| "E" | Supplemental Sick Leave Benefit Plan.......... | 44 |
| "F" | Checkoff Agreement................................. | 46 |
| "G" | ARAMARK Services:  Bank America Units... | 48 |

*JM/opeiu-3-afl-cio(51)jy*

## PREAMBLE

This Agreement is made and entered into by DAVRE'S, INC., operating a food service facility at 555 California Street, San Francisco, California, hereinafter referred to as the "Employer," and HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES UNION, LOCAL 2, hereinafter referred to as the "Union."

## AGREEMENT

## SECTION 1. RECOGNITION AND RIGHTS

1.1 <u>Union Recognition</u>. The Employer recognizes the Union as the sole collective bargaining agency for all employees of Davre's, Inc., for all food service at 555 California Street, San Francisco, California engaged in with the preparation, handling, and the serving of food and/or beverages, including without limitations those employed in classifications set forth in the wage addendum of this Agreement.

1.2 <u>Management Rights</u>. Except as otherwise provided in this Agreement, it is mutually agreed that it is the sole right of Management to manage the restaurant and direct the work force. It is specifically understood and agreed that all rights and privileges that Management had prior to the signing of this Agreement are retained by Management *(Addendum "G")*.

1.3 <u>Union Rights</u>. Except as otherwise provided in this Agreement, the Union retains all rights granted to labor organizations under the Labor Management Relations Act of 1947 and all applicable federal and state laws and regulations. The Employer further agrees that the Union and its members shall be allowed to engage in lawful Union activity.

(a) The Employer shall provide new hires with Union Membership packets, provided by the Union, which shall include information regarding dues, withdrawal cards, basic health and welfare eligibility, Union resources and the Union contract.

(b) The Employer agrees to distribute delinquent dues notices prepared and provided by the Union and upon request by the Union, to members in arrears on the jobs.

(c) Union Field Representatives or designated Shop Stewards shall be afforded the opportunity to meet with new hires for thirty (30) minutes, upon request by the Union, at a mutually agreed upon time within thirty (30) days from the date of hire.

(d) At times mutually agreed to, the Union shall be provided meeting space, on Davre's property subject to availability, in order to meet with groups of employees as needed.

(e) Shop stewards shall be released from work to assist the Union in arbitration and adjustment boards hearings, as needed, on unpaid time and with reasonable notice, which should be at least seven (7) days and should include only arbitrations and adjustment boards relating to the steward's own Employer.

(f) Shop stewards shall be granted up to six (6) days per year unpaid release time to attend steward trainings and meetings conducted by the Union. Stewards must give reasonable notice of at least fourteen (14) days prior to the training, and not more than one (1) steward per work unit per shift may attend. Work unit may by an outlet, e.g. a restaurant, a kitchen, and training should be one (1) day at a time unless by prior mutual agreement if lasting more than one (1) day.

agrees, upon receipt of written request by the Union, to discontinue the employment of any such employee. The Union will hold harmless the Employer from any claim for backpay or damages from an employee who is terminated pursuant to this section. The Union will provide a qualified replacement employee before the Employer is obligated to discharge any employee under this section.

3.3 **Checkoff Agreement**. It is agreed that the Employer shall, during the term of this Agreement, deduct each month Union membership dues, initiation fee and assessments from the pay of those employees who have authorized such deduction in writing as provided in the Checkoff Agreement *(Addendum "F")*.

## SECTION 4. HIRING

4.1 **Non-Discriminatory Hiring**. In the hiring of employees, the Employer shall determine the suitability and competence of the employees, provided that such determination shall not be used to discriminate against employees on the basis of race, color, creed, sex, sexual preference, age, handicap as defined by law, religion or national origin as defined by law, or to discriminate against the members of the Union. Selection by the Union of applicants for referral to jobs shall be on a non-discriminatory basis and shall not be based on, or in any way affected by Union membership, by-laws, rules, regulations, constitutional provisions or any other aspect or obligation of Union membership, policies, or requirements. In carrying out this provision, the Union shall maintain lists of applicants for referral for the various classifications of jobs covered by this Agreement. Eligibility for registration on said lists shall be determined solely upon the basis of each applicant's experience and qualifications for the particular classification of work involved. When the Employer applies to the Union as provided below, eligible applicants will be referred to the Employer in the order of their registration on said list unless the Employer requests referral of a particular applicant or group of applicants for specific job openings. Said list of eligible applicants shall be available to the Employer at the Union dispatch office upon request.

4.2 **Filling Vacancies**. In filling all vacancies and hiring additional or new help, the Employer shall apply to the Union and the Employer shall have the right to choose from among all applicants for referral and, except as otherwise provided in this section, to reject any job applicant referred by the Union. In the event that the Union is not able to provide competent help suitable for the position to be filled, the Employer shall be at liberty to hire persons not referred by the Union. Any person hired through an employment agency to fill a vacancy shall be reimbursed by the Employer in full all monies paid to said employment agency, other than governmental agencies. This reimbursement shall not apply to a hiring to fill a vacancy listed with the Union and for which the Union does not dispatch a suitable and competent person. The Union agrees to accept for membership any such person so hired on the same terms and conditions on which any employees, now members of the Union, are admitted to membership.

4.3 **Union Notification**. The Employer shall notify the Union on forms mutually satisfactory to both parties of the employment of all classifications of new employees working under the jurisdiction of this Agreement within seven (7) days, Saturdays, Sundays or Holidays excepted, of the date of employment of such individuals.

4.4 **Appeal**. Any person or party to this Agreement believing that the provisions of this section have not been observed shall have the right of appeal to the Adjustment Board established by this Agreement, provided said appeal is filed within ten (10) days from the time said complaint arose, excluding Saturdays, Sundays and Holidays.

1.4 Employee Committee. The Employer recognizes the Union's Employee Committee as a legitimate part of the Union's structure in the restaurant. The Employer agrees to meet periodically with the Committee to discuss problems or issues of concern to the employees and management.

## SECTION 2. DEFINITIONS

2.1 Regular Employees. All employees other than extra employees as defined in *Section 2.2* shall be considered regular employees and shall accrue seniority in accordance with this Agreement.

2.2 Extra Employees. Any employee who is temporarily hired to supplement the existing work force, and whose length of employment does not exceed the probationary period.

2.3 Work Day. An employee's work day will consist of up to seven and one-half (7-1/2) straight-time hours worked or compensated within any twelve (12) hour period. No employee shall be allowed to work more than one (1) shift in any twenty-four (24) hour period. This shall not prohibit the performance of overtime work consecutive with the shift completed. No less than ten (10) hours shall elapse between the end of one (1) work day of the employee, and the next.

2.4 Full Shift. A full shift shall be defined as any shift of five and one-half (5-1/2) hours or more.

2.5 Business Day. Any mail delivery day, Monday through Friday, exclusive of Saturdays, Sundays, and any recognized holiday.

2.6 Work Week. Five (5) days shall constitute a week's work. Employees who work fewer than thirty (30) hours per week may, at their option, accept a schedule to work a sixth (6th) day at straight-time rates.

2.7 Masculine includes Feminine. Whenever in this Agreement the masculine gender is used, it shall be deemed to include the feminine gender.

2.8 Shift. A shift is the designated starting and finishing time that an employee works.

2.9 Schedule. The schedule is any grouping of shifts in a week.

## SECTION 3. UNION MEMBERSHIP AND CHECKOFF

3.1 Good Standing. It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the effective date of this Agreement shall remain members in good standing and those who are not members on the effective date of this Agreement shall, on or after the thirtieth (30th) day following the effective date of this Agreement, become and remain members in good standing of the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its effective date shall, on or after the thirtieth (30th) day following the beginning of such employment, become and remain members in good standing of the Union.

3.2 Enforcement. In the event any employee neglects, fails, or refuses to comply with the provisions in *Section 3.1* above by the timely tender of the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union, the Employer

## SECTION 5. BUTTONS

The Employer shall not prohibit the wearing of current Union Buttons.

## SECTION 6. INTERVIEWS

Properly authorized representatives of the Union shall be permitted to investigate the standing of all employees covered by this Agreement and to investigate conditions to see that the Agreement is being enforced, provided that no investigation or interview shall involve an employee while that person is actively engaged in work responsibilities. Management shall not unreasonably deny Union representatives the right to interview employees during non-rush business hours. The Employer as well as the Union representative shall conduct themselves in such a manner so as to carry out the intent and spirit of this section and so as not to disrupt the nature of the business.

## SECTION 7. DELINQUENT PAYMENT OF WAGES

If the Employer becomes delinquent or tardy in the payment of wages, or is operating in receivership, or in the Board of Trade, or through a Creditor's Committee, or in the case of liquidation, bankruptcy, or sale of the Employer's business, all salaries and vacation pay accrued become due and must be paid at once. In such cases, the Union reserves the right to demand and receive daily payment of wages for all members employed.

## SECTION 8. NO DISCRIMINATION

8.1  Lawful Treatment. There shall be no discrimination against any employee on account of membership in, or activity on behalf of the Union, or because of race, color, creed, sex, sexual preference, age, handicap as defined by law, religion, or national origin as defined by law.

8.2  Equal Opportunity. The Employer and the Union recognize the critical importance of insuring equal employment opportunity in all job categories covered by this Agreement for all persons regardless of their race, color, creed, sex, sexual preference, age, handicap as defined by law, religion or national origin as defined by law. The Employer and the Union further acknowledge that, despite past good faith efforts to achieve this goal, further progress is both possible and necessary.  In order to achieve such progress, the parties agree to engage in affirmative action consistent with applicable state and federal law and other provisions of this Agreement. To implement their affirmative action policy, the Employer and the Union shall endeavor to administer hiring, working conditions, benefits and privileges of employment, compensation, training, upgrading and promotion, transfers and terminations of employment including layoff and recalls for all employees without discrimination. It shall be the policy of the Employer to make possible the upgrading of current employees from the lowest classifications to the highest consistent with the employee's skills, merit and ability without regard to race, color, creed, sex, sexual preference, age, handicap as defined by law, religion or national origin as defined by law.

8.3  Mutual Notification. Each party agrees to advise the other of outstanding equal employment opportunity problems of which it is aware. The Employer and the Union will jointly seek solutions to such problems. The Employer shall consult with the Union prior to any changes in the equal employment opportunity program.

## SECTION 9. INDIVIDUAL CONTRACTS

No employee shall be compelled or allowed to enter into any individual contract or agreement with the Employer concerning the conditions of employment varying the conditions of employment contained herein.

## SECTION 10. PICKET LINES

Refusal of an employee to cross a bona fide picket line sanctioned and approved by the San Francisco Labor Council or by an International Union whose local unions are not affiliated with the San Francisco Labor Council, which sanction has been approved by Local 2, shall not be construed to be a breach of this Agreement. The Union agrees not to cause any strikes or stoppages of work (except as otherwise provided in this Agreement), and the Employer agrees not to engage in any lockout during the term of this Agreement.

## SECTION 11. MILITARY SERVICE

Employees entering the military or naval services, Red Cross, Alternative Service or other combat relief service of the U.S.A., during the life of this Agreement, will be considered on leave of absence and shall retain their seniority while in such service and be returned to their former position upon General Discharge under Honorable Conditions from the service provided they are physically and mentally capable of working and make application within the period specified in the Selective Service Regulations.

## SECTION 12. DISCHARGE AND WARNING

12.1    Cause. Except as set forth in this section, no worker shall be disciplined, suspended or discharged without just cause. When an employee has been disciplined, suspended or discharged, the Union must be notified immediately and an opportunity shall be given for joint investigation by the Employer and the Union. Any member found discharged for Union activities or in violation of the terms of this Agreement shall be reinstated on the job with full pay for the time lost.

12.2    Warning Notices. The Employer recognizes that a warning letter may be required to demonstrate just cause. Copies of all written warning notices to employees shall be forwarded to the Union. Written notices shall be deemed invalid after twelve (12) months from the date of any such notice. Suspensions shall not be used as a basis for discipline after a period of twenty-four (24) months.

## SECTION 13. HEALTH AND WELFARE AND PENSION AND EDUCATION TRUSTS

13.1    Health and Welfare Trust. There is presently in effect the San Francisco Culinary, Bartenders and Service Employees Welfare Fund, established pursuant to a Trust Agreement dated the 8th day of March, 1967 between the Golden Gate Restaurant Association, Hotel Employers Association of San Francisco, San Francisco Hotel Association, Inc., and San Francisco Club Institute and the Hotel Employees and Restaurant Employees Union, Local 2 under which group medical, surgical, hospital, prescription drug, dental, life insurance, vacation, sick leave, and other supplemental benefits plans have been established and amended as of February 1, 1977. The

said plans shall continue in effect under this Agreement and under said Trust Agreement as the same may be amended from time to time.

13.2    Pension Trust Fund. There is presently in effect the San Francisco Culinary, Bartenders and Service Employee Pension Plan and Trust Agreement, executed on the 20th day of March, 1958, as amended between the Golden Gate Restaurant Association, the Hotel Employers Association of San Francisco, the San Francisco Hotel Association, Inc., the San Francisco Club Institute and the Hotel Employees and Restaurant Employees Union, Local 2, and Service Employees Union, Local 14. The Employer shall contribute to the Pension Fund established under said Pension Plan and Trust Agreement as defined in Section 13.8 below.

13.3    Actuarial Gains. With regard to the actuarial gain from the Pension Plan years ending March 31, 1988; March 31, 1989; and March 31, 1990, one-half (1/2) of the actuarial gain for each year shall be utilized to reduce unfunded vested liability and one-half (1/2) shall be utilized to provide a pension benefit improvement for all pensioners and non-pensioners for all years of credited service in an amount to be actuarially determined as of the end of the plan year for which the actuarial gain has accrued and in a manner so as not to require an increase in either the Employer contributions or the amortization period of the unfunded vested liabilities.

13.4    Eligibility: Welfare and Education and Pension Trust Funds. For the purpose of this subsection, an eligible employee is defined as a non-probationary employee who has been scheduled to work, or worked, a regular schedule of three (3) or more hours per day, five (5) days per week, in at least three (3) of the four (4) full payroll weeks of the Employer immediately preceding the first day of the month for which contributions are due; or said non-probationary employee is eligible if he or she has been scheduled to work, or worked a regular schedule of three (3) full shifts or more per payroll week in at least three (3) of the four (4) full payroll weeks of the Employer immediately preceding the first day of the month for which contributions are due. The first thirty (30) days absence from work due to bona fide sickness or disability, vacation or holidays shall be counted as time worked.

13.5    Accelerated Eligibility for Health and Welfare. A new employee of a contributing Employer who in the month prior to said employee's employment with a contributing Employer was employed by an Employer with a collective bargaining agreement with the Union, and was entitled to health and welfare benefits at such previous place of employment pursuant to a collectively bargained plan with the Union, shall be eligible for the benefits covered under the Health and Welfare Fund (medical, hospital, life insurance, dental and other benefits) commencing with the first day of the month following the month in which a contribution is required to be paid, and is paid, to the Fund on his or her behalf.

13.6    Contribution Rates. Effective November 1, 1996, the total Employer contribution to all Funds shall be $347.83 per month per eligible employee unless waivers are effected pursuant to Section 13.14.

        The restaurant will pay the following increases for Health & Welfare, Pension, Dental, Supplemental Sick Leave and Supplemental Vacation Fund: $63.76 per month additional effective November 1, 1997. Effective November 1, 1999 The Employer's contribution will be increased by up to $20.00 per month per eligible employee. In the event such increases exceed $20.00 per month, at the Union's discretion, either the employees shall make co-payments to make up the shortage, or have deducted $.05 per hour from the scheduled increase for the first $5.00 over the $20.00 "cap" to the maximum  Changes in the contribution rates for the years 2000 and 2001 shall be subject to Wage and Benefits Reopener. The Union shall decide which portion

of said total shall be used for each said purposes; but the restaurant shall pay no more than the above rate and increases per month per year for any and all such benefits.

The same level and kind of retiree fringe benefits as were in effect on August 31, 1987 shall continue for the term of this Agreement, subject only to the discretion of the Trustees to reduce the benefits offered by the Trust Funds in extreme financial emergencies or to increase retirees benefits if circumstances permit.

Nothing in this Agreement shall be construed to require Employer contributions in excess of the amount herein.

13.7    Contribution Rates; Pension Trust.  The Employer shall contribute to the San Francisco Culinary, Bartenders and Service Employees Pension Trust Fund the amount of sixty-five dollars ($65.00) per eligible employee per month (which is part of, not in addition to the contribution amount listed in *Section 13.6* above).  During the life of this Agreement there shall be no Employer contribution decreases.  Increases in contributions to the Pension Fund shall be utilized to provide a pension benefit improvement in an amount to be actuarially determined.

13.8    All Trusts Binding.  In order to effectuate the purpose of this section, the Employer hereby further agrees to accept, be bound by, and comply with in all respects as fully as though he were a signator to that certain Trust Agreement dated March 8, 1967, by which the San Francisco Culinary, Bartenders and Service Employees Welfare Fund Trust was established, the San Francisco Culinary, Bartenders and Service Employees Pension Plan and Trust Agreement dated March 20, 1958, and the San Francisco Hotel-Restaurant Labor-Management Education Trust Fund Trust Agreement dated July 1, 1970.  Receipt of a copy of each of said Trust Agreements is hereby acknowledged by the Employer.  The Employer further agrees to accept and be bound by any and all amendments to said Trust Agreements and the plans of benefits established thereunder.

13.9    No Duplications.  All fringe benefits covered by this Agreement shall be coordinated with benefits or contributions mandated by state or federal legislation for the purpose of eliminating duplications in benefits or Employer contributions for benefits.

13.10    Posting of Monthly Reports.  The Employer shall be required to post in an area frequented by employees a copy of the monthly Employer Remittance Form the Employer sends each month to the Trust Funds administrator without listing Social Security numbers.  Such posting shall conform to the terms of the Employer's collective bargaining agreement as an official union notice.  The administrator shall provide the Employer with such additional copies of the form for the posting as necessary.

13.11    Liquidated Damages and Delinquencies.

(a)    Employer contributions required by a collective bargaining agreement shall be payable on the tenth (10th) day of the month for the immediately preceding month, and shall be payable to the Funds in care of the custodian designated by the Trustees.

(b)    Payments shall be accompanied by complete reports on forms furnished or approved by the Trustees, so that the contributions can be allocated accurately.  For any report period for which an Employer fails to file a report, such Employer shall be considered delinquent until the proper report is filed by the Employer and accepted by the Trustees; and the amount due from the Employer for the report period for which the Employer has failed to file shall be deemed

to be not less than the amount due pursuant to the most recent complete report filed by the Employer covering an equivalent period of time. The Employer may be compelled by the Board or its assignee, by way of subpoena, civil discovery or other proceeding, to prepare, submit and file with the Trusts proper reports for any period for which the Employer has previously failed to file.

(c) Contributions will be timely received if actually received by the designated custodian on or before the 20th of the month in which they are due; contributions will also be timely received if mailed with the correct address and postage in an envelope postmarked on or before the 20th of said month, unless the 20th falls on a Saturday, Sunday or holiday, in which case the envelope must be postmarked no later than the next workday.

(d) It is recognized and acknowledged that the regular and prompt payment of Employer contributions to each of the Funds is essential to the operation of the Trusts and the provisions of benefits under the Plans, and that it would be extremely difficult, if not impossible, to fix the actual expense and damage to the Funds and to the covered employee which would result from the failure of an Employer to make such monthly contributions in full within the time provided.

(e) The amount of damage resulting from each such failure to make timely contributions hereunder, as defined above, by way of liquidated damages and not as a penalty, is presumed to be ten percent (10%) of the amount due and unpaid to each Fund, which amount shall become due and payable to the Funds at the principal office of the Funds upon the day following the 20th day of the month in which said delinquency occurred. Such liquidated damages shall be added to and become part of said contributions due and unpaid; and from the first day of the month following the month in which the payment became delinquent the whole thereof shall bear interest at the rate of ten percent (10%) per annum.

(f) If the Employer further defaults in the payment of any amounts due the Funds following receipt of a written ten (10) day notice of claimed delinquency, then in addition to the contribution due and the liquidated damages provided for in this section, there shall be added to the obligation of said defaulting Employer all costs and fees incurred by the Funds in the collection of the same, in the event any action or proceeding is commenced to enforce payment by the Employer. Such costs and fees which the Trustees are entitled to recover in their own names or otherwise, shall include, without limitation, court costs.

13.12  Employer Liability. The failure of the Employer to make the required contributions shall cause the Employer to be personally liable under this Agreement for the benefits due the employee specified in the plan or plans hereinabove referred to, if said employees do not receive said benefits by reason of the Employer's failure to make such contribution on their behalf.

13.13  Selection of Employer Trustee and Amendments of Trust Documents

(a) The Employer agrees to participate in an election among all employers bound to the Trust Documents, who were members of the Golden Gate Restaurant Association on September 1, 1986, of an individual who shall act as a Trustee to the Funds in place of the Golden Gate Restaurant Association appointed Trustee. The election shall be by majority vote, one vote per former G.G.R.A. member, at a meeting convened within sixty (60) days following the signing of the collective bargaining agreement.

(b) The parties hereto recognize there may be a need to periodically amend the Trust Agreements in order to implement this Agreement concerning the selection of an employer Trustee

to replace the G.G.R.A. Trustee, or to comply with new laws or other changed conditions. Therefore, it is agreed that the Trustee elected as provided above, also shall have the authority to negotiate amendments to the Trust Agreements and execute same on the Employer's behalf as shall be necessary to comply with the law or maintain the Trust Funds. Any unresolved disputes in any such negotiations of amendments to the Trust Agreements shall be resolved by final and binding interests arbitration.

### 13.14    Health and Welfare Fund Waiver

Any eligible employee who can show evidence that he/she is covered under the Health and Welfare plan of another individual may elect to be removed from coverage under the Health and Welfare plans provided for under this Agreement and may receive one hundred dollars ($100.00) per month of the Health and Welfare contribution that the Employer would otherwise have made on the employee's behalf pursuant to *Section 13.6* of this Agreement. Such election shall be in writing, on a form jointly agreed upon by the Employer and the Union. A copy of this form and evidence of coverage shall be sent to the Union, and shall be effective at the time the Employer would have made the next contribution on the employee's behalf pursuant to *Section 13.6*. Upon receipt of such written waiver, the Employer will no longer be obligated to make monthly contributions for Health and Welfare coverage required under *Section 13.6* on the waiving employee's behalf. The Employer shall have no responsibility to verify the evidence of alternate coverage provided or to request updates on such evidence.

An employee who has chosen to waive coverage under this section may make written request to the Employer, with a copy to the Union, that he/she shall be returning to coverage under this Agreement. Upon receipt of such written request, the Employer shall commence making all contributions required by *Section 13.6* following the next full month in which the employee is eligible for said contributions.

Any employee who requests that they be returned to coverage under this Agreement shall be returned subject to all terms and conditions of the then current Health and Welfare plans.

An employee may elect to be removed from coverage pursuant to this section only once during the term of this Agreement.

### 13.15    Legal Plan

Effective April 1, 1995 for March 1995 hours, the Employer shall contribute five cents (5¢) per hour worked or paid for in the bargaining unit to provide legal services for employees and their dependents. These monies may not be used in support of any legal actions against the Employer and/or the Union.

## SECTION 14. GRIEVANCE PROCEDURE

It is mutually agreed between the Parties that the speedy resolution of grievances is in the best interests of the employees and the Employer. Timely settlement of disputes fosters better communication, builds morale and trust, and ultimately creates a sense of teamwork in the workplace. To that end, the Parties have created the following grievance procedure which encourages the employee to first talk to their supervisor when questions, problems, complaints or disputes arise, and encourages the resolution of grievances at the lowest possible levels and provides for a quick and fair resolution of problems and disputes.

(a)   Should disputes arise between the employee or the Union and the Employer regarding the interpretation and/or application of the specific terms of this Agreement and/or disciplinary action, including discharge taken pursuant to alleged violations of house rules, work rules, procedure and/or terms and conditions of this Collective Bargaining Agreement, such disputes shall be processed in the time and manner prescribed herein.  With the exception of the requirement to hold an Adjustment Board within thirty (30) days, all other time limits in this process exclude Saturdays, Sundays and Holidays.

Time limits at any step in the procedure may be waived by the mutual agreement of the parties.

Informal Step.   The employee may, within five (5) days of the incident or circumstances giving rise to the dispute, take the matter up with his immediate supervisor.  While this step is encouraged, it is not required.

**Step 1.**
(a)   Within ten (10) days of the incident or circumstances giving rise to the dispute, the designated Union representative (Field Representative or Shop Steward) and the manager involved in the problem or dispute shall discuss the matter and attempt to reach a resolution. The employee is encouraged to attend this step, but is not required to do so.

(b)   Settlements reached at this level shall be considered non-precedential, unless the Human Resources Director and the Union Field Representative agree that the settlement shall be reduced to writing and may be used as a precedent in the future.

(c)   The manager involved in the Step 1 meeting shall respond within three (3) days of the Step 1 meeting.

**Step 2.**
(a)   If the grievance is not satisfactorily resolved at Step 1, the designated Union Representative shall be free to meet with and present the grievance to the General Manager or his designee.

(b)   The Step 2 meeting shall take place within seven (7) days of the response from Step 1.  If there is no response from management under Step 1, the Step 2 meeting shall take place within ten (10) days of the Step 1 meeting.

(c)   The General Manager or designee shall respond within three (3) days of the Step 2 meeting.

**Step 3.**
(a)   If the matter is not satisfactorily resolved at Step 2, the Union may file a written request for an Adjustment Board hearing within seven (7) days of the Step 2 response.  If there is no response from management under Step 2, the Union shall have ten (10) days from the date of the Step 2 meeting to submit the written request.  The written grievance shall set forth the facts giving rise to the dispute including the date and person(s) involved and designate the grievance as well as the remedy sought.

(b)   The Adjustment Board shall be held within thirty (30) calendar days of the written request.

(c)   The Adjustment Board shall consist of two (2) management representatives and two (2) union representatives plus a neutral mediator who shall act as Chairman and who shall mediate the dispute in an attempt to have the parties reach a settlement.  The manager involved in the incident or circumstances giving rise to the dispute should be present at the Adjustment Board.

(d)   The Adjustment Board shall be governed by the following rules:

1.   The grievant shall have a right to be present at the Adjustment Board.

2.   Each party shall have one (1) principle spokesperson.

3.   Outside lawyers or consultants shall not participate in an Adjustment Board.

4.   Any documents presented to the mediator shall be returned to the respective parties at the conclusion of the hearing.

5.   Proceedings shall be informal in nature.  The presentation of evidence is not limited to that presented at earlier steps of the grievance procedure.  The rules of the evidence shall not apply and no formal record of the Adjustment Board shall be made.

6.   The mediator shall have the authority to meet separately with any person or persons but will not have the authority to compel a resolution of a grievance.

7.   If no settlement is reached, the mediator shall provide the parties with an immediate written advisory decision.

8.   The mediator shall state the grounds for his/her advisory decision.

9.   The Adjustment Board shall have no power to alter or amend the terms of the Collective Bargaining Agreement.

10.   The cost if any of the mediator shall be split between the Employer and the Union.

(e)   As an alternative, by mutual agreement in advance of the Adjustment Board hearing, the neutral fifth (5th) person may be designated a mediator/arbitrator who will attempt to mediate the dispute.  In the event a mediated settlement cannot be reached, the decision of the mediator/arbitrator shall be binding on both parties.

(f)   The parties may, by mutual agreement prior to the Adjustment Board hearing, agree that the case may be heard without a neutral fifth (5th) person.

(g)   Grievance Procedure for Employer/Union.  The Employer and/or the Union shall be free to file grievances as described in (a) hereof directly with the other party.  The initial consideration of such grievances shall commence with the Employer Adjustment Board as provided for in Step 3.

**Step 4.   Arbitration.**
(a)   If no settlement is reached at Step 3, a party wishing to arbitrate the dispute shall notify the other party in writing within fifteen (15) calendar days of the Adjustment Board hearing.

(b)  In the event that a grievance which has been mediated subsequently goes to arbitration, no person serving as a mediator between these parties may serve as an arbitrator. Nothing said or done by the mediator may be referred to at arbitration.  Nothing said or done by either party for the first time in the mediation hearing may be used against them at arbitrations.

(c)  If the parties choose to submit a grievance to arbitration, the parties agree to do so according to the rules and procedures of the Federal Mediation and Conciliation Service.  An arbitrator must be selected and a request to the arbitrator for available dates for a hearing must be mutually made within thirty (30) days from the date of submission to arbitration.  These time limits may be extended only by written agreement between the parties.

(d)  The arbitrator shall not have the power to add to, delete from, alter, modify, or change any of the terms, conditions, sections or articles of this Agreement.  His or her decision shall not go beyond what is necessary for the interpretation and application of this Agreement in the case of the specific grievance at issue.

(e)  Each party shall bear their own cost of arbitration, excluding the arbitrator's fee and his related costs which shall be divided equally between the parties.

(f)  Expedited Arbitration.  At the request of either the Union or the Employer, any individual suspension or discharge case shall be submitted to expedited arbitration in accordance with the following rules.  The parties hereby adopt and incorporate by reference the then current Expedited Labor Arbitration Rules of the American Arbitration Association but agree that the arbitration hearing hereunder must be held within thirty (30) calendar days of the submission of the suspension or discharge grievance to expedited arbitration hereunder.

(g)  The parties may, by mutual agreement, request expedited arbitration for issues other than suspension or discharge.  In an expedited arbitration proceeding, both parties shall waive their rights to submission of any briefs and stenographic recordings.  The arbitration proceedings must be continuous to a conclusion.  The arbitrator must render a bench decision immediately following the close of the hearing, followed by a written decision within seven (7) days of the close of the hearing.

(h)  In the event that the Union develops a pattern and practice of abusing this expedited arbitration procedure or substantially lessens the legitimate compromising of grievances, as determined by an arbitrator, then this section shall not apply for the remainder of the contract.

(i)  Notwithstanding any of the foregoing, a claim of any employee for any payment of any additional compensation or sum due under the terms of this Agreement for all forms of overtime, uniform allowance and meals, shall not go beyond a sixty (60) day period, unless such claim is reported to the Union by the aggrieved employee and the Employer is notified by the Union within ten (10) days of the pay period when such claim or sum should have been paid.

## SECTION 15.  PROMOTIONS AND TRANSFERS

15.1  Vacancies

(a)  In filling permanent job vacancies which may exist within the establishment, the senior qualified employees from within the bargaining unit shall be given preference in filling said vacancy prior to the consideration of other applicants.

(b) In the event that an employee who, within sixty (60) calendar days of a promotion, transfer, or filling a vacancy as described above, desires to return to the former job classification or is deemed not qualified for the new position, that employee shall be returned to the former classification at the then current wage scale for the job classification without loss of seniority. In the event said employee received premium pay in the former classification, then they shall retain such premium pay upon return to the former classification.

15.2    Return to Bargaining Unit. An employee promoted or transferred to a position within the establishment outside of the bargaining unit who desires to return to the former job classification shall notify the Employer within sixty (60) calendar days of the date of the promotion or transfer and shall be returned to said former job classification.

# SECTION 16. POSTED VACANCIES

Notices of permanent job vacancies and the effective date of the openings shall be posted when the Employer has advance notice of such openings. In any event, senior employees shall have the right to apply for said vacancies. Any employee interested in being considered for a job vacancy shall submit a written notice to the Employer.

# SECTION 17. SAVINGS CLAUSE

If any provisions or sections of this Agreement be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portions of this Agreement shall not invalidate the remaining portions hereof and they shall remain in full force and effect. The parties agree that upon such invalidation, the parties shall meet within two (2) weeks and negotiate substitute provisions for such parts or provisions rendered or declared invalid.

# SECTION 18. PAYMENT OF SALARY

18.1    Regularly Scheduled Employees. Payment of salary shall be based on ARAMARK's payroll cycle, but in no event less that every two (2) weeks. In case of a discharge of an employee, the employee shall be paid at the time their last shift is completed.

18.2    Extra Employees. The Employer shall pay extra employees at the end of their shift. In the event an extra employee cannot be compensated at the end of the shift, such employee must be paid within forty-eight (48) hours, otherwise the extra employee shall be entitled to penalty pay of one (1) hour at the overtime rate.

# SECTION 19. OVERTIME

All work performed in excess of seven and one-half (7-1/2) hours in any one (1) day, or in excess of thirty-seven and one-half (37-1/2) straight-time hours in any one (1) work week shall be paid at time and one-half (1-1/2) the straight-time hourly rate, except for banquet servers. Banquet servers will be paid time and one-half (1-1/2) for all hours worked beyond eight (8) hours in any one (1) day or forty (40) hours in one (1) work week. Any work required to be performed on the seventh (7th) consecutive day of work shall be compensated at double the rate of pay. There shall be no pyramiding of overtime under any circumstances.

## SECTION 20. REPORTING PAY

When an employee is required to report for work and does report, but is not put to work, the employee shall be paid for one-half (1/2) the scheduled shift. This shall not apply to a person or employee reporting for work under the influence of liquor, non-prescription drugs, or otherwise unfit for work.

## SECTION 21. WORK SCHEDULE

21.1    Posted Schedule.  (Except for banquets) there shall be placed in a conspicuous place a Work Schedule specifying the name and classification of each employee, days off of each employee, starting time and finishing time, meal times and rest periods of each employee, and the Employer shall keep said schedule up to date.  Duplicate copies of Work Schedules (with wages paid and social security number) shall be made available to business representatives of the Union within fifteen (15) days of request.

21.2    Closing Time.  The Employer shall provide a shift extending thirty (30) minutes beyond the closing hour for the service of food direct from the cook's station, which shift shall be designated on the work schedule.

21.3    Extended Shift.  The Employer shall provide for the necessary shift or shifts extending thirty (30) minutes beyond the closing hour of the establishment for the service of food or beverage to customers.

21.4    Leave Early.  The Employer may ask for volunteers to leave early.  In such situation, the employee will be paid for actual hours worked.

## SECTION 22. SHOP STEWARDS

The Union shall have the right to install Shop Stewards in the establishment. The Shop Steward shall not interfere with the management of the business or direct the work of any employee but may advise the Employer of any violations of the Agreement and also notify any employee participating therein.  The Shop Steward shall not be discharged for the performance of the duties in this capacity provided such activity does not interfere with the Shop Steward's regular duties as an employee.

## SECTION 23. BULLETIN BOARDS

The Union shall be permitted to post official signed notices in a designated area.  Said area to be visible to all employees.

## SECTION 24. MEALS

(a)  Any employee working seven and one-half (7-1/2) hours shall receive three (3) meals of food comparable to that served to customers in bona fide restaurants or $4.50 in lieu thereof if such meals are not made available to them.

(b)  Any employee working a five (5) or six (6) hour shift shall receive two (2) meals of food comparable to that served to customers in bona fide restaurants or $3.00 in lieu thereof if such meals are not made available to them.

(c)  Any employee working a shorter shift shall receive one (1) meal of food comparable to that served to customers in bona fide restaurants or $1.50 in lieu thereof if such meal is not made available to them.

(d)  If the Employer chooses not to serve bona fide meals the employee shall receive an allowance of $1.50 per meal or $4.50 per three (3) meals in addition to their wages.

(e)  Employees working a full shift shall be given an opportunity to take their meal break within five (5) hours of the commencement of the shift, provided however, that no employee working a straight shift shall be required to take their meal break before two and one-half (2-1/2) hours from the commencement of the shift. Further provided that no employee working a seven and one-half (7-1/2) hours split shift, or a six (6) hour straight shift shall be required to take their meal break before two (2) hours after the commencement of the shift. Those employees entitled to more than one (1) meal shall eat those additional meals before and/or after their shifts.

(f)  Should the Employer require or permit an employee to work so that it is impossible for the employee to take time off for meals as provided, the employee so affected shall be paid in addition to the employee's cash wages, the sum of $1.50. If, and only if, an employee is assigned to work through his meal period, he shall be paid one (1) hour at the overtime rate, instead of $1.50.

## SECTION 25. EMPLOYEES EATING FACILITIES

In the event that employees are not permitted to eat in the dining room of their establishment, they shall be equally provided with clean and sanitary facilities with adequate space. Employees shall cooperate in maintaining orderly conditions in that section of the establishment where their meals are consumed.

## SECTION 26. DRESSING ROOMS AND LOCKERS

The Employer shall maintain strict observance of all sanitation health laws insofar as they affect the working conditions of the employees. Sanitary dressing rooms with suitable individual lockers shall be made available to all employees. Two (2) Union employees, one (1) of whom shall be a Shop Steward or Business Agent, if available, shall be present in the event the Employer finds it necessary to search lockers.

## SECTION 27. DAYS OFF

All regular employees shall receive two (2) days off in each seven (7) days. Whenever possible and consistent with business needs, the two (2) days off will be scheduled consecutively.

## SECTION 28. RELIEVING AND ASSISTING

Any employee may relieve or assist any other employee, irrespective of craft jurisdiction of the work involved, for a period not to exceed one and one-half (1-1/2) hours per shift at no increase in pay.

## SECTION 29. REST PERIODS

No employee shall be required to work more than two (2) consecutive hours without a rest period of fifteen (15) minutes. No wage deduction shall be made for such rest periods, nor shall the time so allowed be deducted in computing the hours worked or the spread of the shift.

# SECTION 30. VACATIONS

    30.1   <u>Vacation Benefits</u>.  Regular employees shall receive annual vacations with pay as follows:

        After 1 year of service with the Employer......................1 week
        After 2 years of service with the Employer....................2 weeks
        After 5 years of service with the Employer....................3 weeks
        After 15 years of service with the Employer...................4 weeks

    30.2   <u>Vacation Pay</u>.  Pay for the vacation period shall be based on the average weekly wages including overtime received by the employee during the year preceding the vacation. It is understood that tips, meal allowances, uniform allowances and other income are excluded from this calculation.

    30.3   <u>Prorated Vacation</u>.  Earned but unused vacation pay shall be granted on a prorated basis to employees whose services terminate for any cause after six (6) consecutive months of service, payable as specified above. Such employees shall be entitled to 1/12th of the next annual vacation allotment for each month worked since their last anniversary date of employment, rounded to the nearest month.

    30.4   <u>Vacation Schedule</u>. The schedule of vacations may be arranged by the Employer provided that no employee shall be required to start their vacation more than six (6) months after the anniversary date of their employment, and further provided that the Employer give each employee thirty (30) days notice of their vacation date. One week of vacation time may, at the option of the employee, be taken in daily increments providing business conditions permit. The remainder of the paid time off shall be taken in weekly increments. There is only one (1) split of the vacation period to which said employee is entitled per year. No employee shall work for the Employer during his scheduled vacation period.

    30.5   <u>Supplemental Vacation Benefit Plan</u>. The Supplemental Vacation Benefit Plan provided under this Agreement shall be as set forth in *Addendum "D"* attached hereto and made a part hereof.

# SECTION 31. SICK LEAVE OR DISABILITY

    31.1   <u>Annual Allowance</u>

    (a)   <u>Annual Allowance</u>.  After one (1) year of employment in case of illness of an employee, said employee shall be entitled to four (4) days paid sick leave per year. Sick leave shall be paid from the second day of illness or injury unless hospitalized until an employee has attained twelve (12) days accumulated sick leave, at which time such employee shall receive pay from the first day. A sick day's pay shall be defined as the pay the individual would have received based on his normal work hours (shift) and classification over the past 26 weeks.

    (b)   <u>Accumulation</u>.  Employees shall be allowed to accumulate unused sick leave up to a total of 32 days. Upon reaching the 32 days accumulation, said employees shall be entitled, on their anniversary, to cash out all sick days in excess of 32 days at fifty percent (50%) reimbursement of their regular rate of pay from the Employer.

(c)  Supplemental Sick Leave.  The Supplemental Sick Leave Fund shall entitle employees to additional sick days as follows:

After 4 year of employment .............2 days from the Fund
After 8 year of employment..............8 days from the Fund
After 12 year of employment...........12 days from the Fund

(d)  Doctor's Note.  In order for sick leave to be paid, the Restaurant may request verification of illness or injury of three (3) or more consecutive working days for an absence the day before or day after an employee's day off, holiday, or vacation, or in cases where employee's history or the circumstance surrounding an unscheduled absence create reasonable doubt as to the validity of the absence, management may require the employee to provide a doctor's note for that absence or, in the alternative, may instead require a doctor's note for all future sick leave for a reasonable period of time not to exceed six months.

(e)  Integration. Sick leave pay shall be integrated with Unemployment Compensation Disability or Workers' Compensation Benefits so that the sum of the disability sick leave pay allowable hereunder and the said Benefits which can be paid to an employee during a week in which the employee is absent from work for reason of illness or disability shall not exceed one hundred percent (100%) of the employee's regular weekly take home pay for said week.

(f)  Sick Leave:  Sick leave may be used for an employee's illness, the illness of a child or other dependent, spouse or domestic partner.

(g)  Unpaid Personal Days   The employee has a right to five (5) unpaid personal days, except where the Employer's past practice is to allow more personal days. Such personal days will be given by the Employer upon written request, except that such written request may be denied for legitimate business reasons. Such request once granted shall not be revoked and will be granted on a first come, first serve basis or in the event of simultaneous requests, upon the basis of seniority, and must be granted or denied no later than twenty (20) days before the date requested. Employees shall submit a request for personal days in writing on a form to be provided by the Employer with a duplicate copy given to the employee.

31.2  Supplemental Sick Leave Benefit Plan.  The Supplemental Sick Leave Benefit Plan shall be as set forth in *Addendum "E"* attached hereto and made a part hereof.

## SECTION 32.  HOLIDAYS

32.1  Recognized Holidays.  The following days shall be recognized as holidays under this Agreement, and shall be celebrated on the date so specified.

Labor Day
Thanksgiving Day
Christmas Day
New Year's Day
Washington's Birthday
Memorial Day
Independence Day
Floating Holiday  on each anniversary after 09-01-98

32.2  Holiday Pay Eligibility.  All non-probationary Regular employees, who are regularly scheduled to work on the above holidays, shall receive straight-time pay for such holidays at the rate for the classification of work regularly performed only if the establishment closes specifically for the holiday.  Employees who are regularly scheduled five (5) days per week shall receive holiday pay if the holiday falls on their regularly scheduled day off.

32.3  Work on Designated Holiday.  Any eligible employee called to work on a designated holiday who refuses to work shall not receive holiday pay for such day.  Any eligible employee who works on one of the above holidays shall receive time and one-half (1-1/2) for the entire shift, and double-time for Thanksgiving Day and Christmas Day, but not holiday pay.  Should any of the above recognized holidays be celebrated on an eligible employee's regularly scheduled day off, he shall not receive holiday pay for not working unless he/she is regularly scheduled to work five (5) days per week.

## SECTION 33.  SENIORITY

33.1  Acquisition of Seniority.  Seniority shall only apply to Regular employees who have worked throughout a ninety (90) calendar day period.  Seniority shall be from the first day worked in the classification.  This period shall constitute a probationary period during which an employee may be terminated without recourse to the Grievance Procedure provided herein.  Unless otherwise specified in this Agreement, no probationary employee shall be eligible for any benefits.

33.2  Application of Seniority

(a)  In the event the Employer finds it necessary to lay-off employees due to a slackness of business, such layoffs shall be on the basis of classification seniority within the work unit provided the senior employee(s) are qualified to perform the remaining work.  The least senior employee in any job classification shall be laid-off before any more senior employees (i.e. an employee having a longer period of continuous service in the job classification).  Any employee laid off in excess of two (2) weeks shall have the right to exercise his classification seniority to displace a less senior employee in another work unit.  An employee may maintain job classification seniority in more than one classification until the employee exercises his or her seniority rights to accept full-time employment in one classification.

Any disputes arising over an employee's ability to perform the remaining work shall be arbitrated in accordance with the arbitration provisions in subsection (b) herein.

(b)  Closures.  In the event of lay-off due to closure of any of the following work units:

Cafeteria
Concourse Kitchen
Bankers Club Dining Room
Carnelian Room Dining Room
Bankers Club Kitchen
Carnelian Room Kitchen

such laid off employees in the closed work unit shall have the right to exercise his classification seniority to displace a less senior employee in another work unit provided they are qualified to perform the work.  Where a dispute arises over an employee's ability to perform the work, said dispute shall be referred to an arbitrator [selected from a panel of three (3) mutually agreeable standing arbitrators] for a one (1) day hearing to be held within one (1) week of the day the dispute

arose. There shall be no briefs or transcripts and the arbitrator shall issue an oral decision at the close of the hearing. The arbitrator shall determine qualifications based on experience, skill and familiarity with the operations.

33.3 <u>Termination of Seniority</u>. Seniority shall be terminated by:

(a) Discharge for cause upheld by the Grievance Procedure;
(b) Voluntary quit;
(c) Twelve (12) consecutive months off the job.

33.4 <u>Preference</u>. Senior employees shall have preference as follows:

(a) <u>Recall</u>: Senior employees shall be recalled first in order of classification seniority.

(b) <u>Schedules</u>: Senior employees will have preference for choice of schedules including days off as offered by management. It is understood that management shall be obligated to create schedules which maximize the opportunity for full-time employment in so far as business conditions allow.

(c) <u>Vacations</u>: Senior employees shall have preference for choice of vacations schedules within their classification, as arranged by the Employer.

33.5 <u>Union Notification</u>. When an employee has been laid off, the Union must be notified within five (5) business days, excluding Saturday, Sunday and Holidays.

## SECTION 34. DEDUCTIONS AND DONATIONS

No employee shall be permitted or required to subscribe to any form of insurance or make contributions, or to suffer any deductions from their wages without written authorization of the employee, except such as may be required by law.

## SECTION 35. EMPLOYMENT CONDITIONS

When an employee is required as a condition of employment to be bonded, the Employer shall pay the cost of said bond. No Employer shall make any deduction from wages or require any reimbursement from an employee for any cash shortage, breakage, walkouts, or loss of equipment, unless it can be shown that the shortage, breakage, walkout or loss is caused by a dishonest or willful act, or by the gross negligence of the employee. Notwithstanding the foregoing provision, where an employee has the exclusive and personal control of cash funds of the Employer and is required to account, under reasonable accounting procedures, for said funds, the Employer may, upon prior written notice, require reimbursement from such employee for cash shortages.

## SECTION 36. PREMIUM PAY

The scale of wages in this Agreement are minimum scales and do not prohibit a superior worker from receiving a higher salary. Premium pay employees shall receive as wage increases under this Agreement the amount by which the minimum rate for the classification in which they are employed is increased effective on the dates set forth in the wage schedules.

## SECTION 37. EQUAL PAY FOR MEN AND WOMEN

The wage scale shall apply equally to male and female employees.

## SECTION 38. COMBINATION JOBS

38.1 _Higher Rate_. Except as provided in _Section 28 Relieving and Assisting_ hereof when an employee occupies a position combining two or more classifications in any day the employee shall be paid for that day at the rate of pay for the highest classification. This shall not apply to relief for meal periods nor to employees for whom combination scales are fixed in this Agreement.

38.2 _Management Authorization_. No employee shall work without prior instruction by the Employer or an authorized representative in any classification other than that designated on the posted work schedule for such employee. Any employee who without prior instructions works in a classification, other than designated for such employee, shall receive no compensation by reason thereof provided the Employer has designated the employee's regular classification on said work schedule.

The names of persons authorized by the Employer to give such instructions shall be posted on the work schedule and any such instructions given for performing work outside the employee's classification shall be in writing and given to the employee. There shall be no discrimination against any employee for refusing to work outside the employee's posted classification.

38.3 _Voluntary Nature_. For all employees, regardless of the date of hire, combination work between classifications shall be voluntary. No employee shall be discriminated against in his or her conditions of employment for refusal to accept an offer of combination work. Craft Rule restrictions shall not apply to combination work.

38.4 _Sample Combination Jobs_. The below examples are set forth to illustrate, without limitation, possible combination jobs.

(a) _Simultaneous_. Where two (2) or more classifications of work are performed on the same shift beyond one and one-half (1-1/2) hours, the employee shall be paid the highest rate for the work performed.

Example: Pantry/dish washing work performed throughout the shift.

(b) Split Shift. Where one (1) or more classifications are worked for each portion of the split shift, the employee shall be paid the classification rate for each portion of the shift; plus, any applicable split shift premium.

Example: Bartender at lunch; host at dinner.

(c) _Combination Week_. Where one (1) or more classifications are performed for the first part of the week and one (1) or more classifications are performed the second part of the week, the employee shall be paid the classification rate for each day of the week.

Example: Two (2) days as bartender; three (3) days as host.

38.5  Permanent Combinations.  Permanent combination positions shall be offered voluntarily in accordance with *Section 16 Posted Vacancies*, with preference given in the following sequence:

(a)  Senior qualified employees within the classification;

(b) Qualified employees within the restaurant in other classifications with the greatest house seniority;

(c)  New hires.

Combination work shall not be utilized so as to reduce the opportunities for full time work in the employees' chosen classification.

38.6  Temporary Combinations.  Vacancies in excess of thirty (30) days shall first be offered to employees within the classification and then throughout the house.

## SECTION 39. LEAVES OF ABSENCE

Leaves of Absence.  Leaves of absence without pay for reasonable periods shall be granted by the Employer for reasons of bona fide illness, death in the immediate family or other reasons mutually agreed to by the Employer and the employee, which leaves of absence shall not affect the employee's rights under this Agreement.  Immediate family is defined as Mother, Father, Brother, Sister, Spouse or Child.  Upon granting the leave of absence, the Employer and the employee shall notify the Union in writing of said leave of absence.  In the administration of this section, each case shall be handled on an individual basis with past practice not controlling.

## SECTION 40. JURY DUTY

All non-probationary employees who actually are impaneled as a petit juror shall be paid by the Employer any difference between the total amount paid including expenses for such service by the government and the total employee's lost wages up to a maximum of ten (10) working days straight-time wages per contract year as set forth in the attached wage scales.

## SECTION 41. FUNERAL LEAVE

After completion of one (1) year of employment, in the event of a death in the immediate family of a non-probationary employee, the employee shall, upon request, be granted such time off with pay and without loss of benefits, as is necessary to make arrangements for the funeral and attend same, not to exceed three (3) regular scheduled working days.  This provision does not apply if the death occurs during the employee's paid vacation, or the employee is on leave of absence, lay-off or sick leave.  The Employer may request reasonable proof of such funeral. Immediate family is defined as Mother, Father, Brother, Sister, Spouse or Child.

## SECTION 42. MATERNITY LEAVE OF ABSENCE

Pregnancy Disability Leave and/or Maternity Leave of Absence shall be granted for reasonable lengths of time without loss of seniority and other privileges.

## SECTION 43. STUDENTS

There shall be a classification for bona fide students which shall be subject to the following conditions:

(a) The work week shall not exceed twenty-five (25) hours per week unless a bona fide emergency occurs. The Union must be notified prior to employment.

(b) Proof of student status is necessary.

(c) Wage rates shall be eighty percent (80%) of the hourly rate, but no less than the minimum wage.

(d) Health and Welfare Fringe Benefit Contributions shall be paid if they qualify. No dependent coverage will be provided.

## SECTION 44. FAST FOODS

There shall be established a restaurant classification for "Fast Food Operations" which apply to an operation which has self service or limited service.

## SECTION 45. PERSONNEL FILES

The Employer shall at reasonable times and reasonable intervals, upon the request of an employee, permit that employee to inspect such employee's personnel file.

## SECTION 46. LEAVE FOR UNION SERVICE

(a) In the event that an employee is elected or appointed to a position of full-time service with the Union, the Employer shall grant said employee a leave for Union service. The employee shall continue to retain seniority during the period for such leave. Seniority is defined as the length of the most recent continuous period of service with the Employer.
Upon completion of service with the Union, the employee shall be returned to the employee's former job at the appropriate rate of pay for that position, provided the employee applies for work within ninety (90) days after completion of Union service.

(b) Shop Stewards, members of the Executive Board of the Union, members of the Contract Negotiating Committee and other employees with Union responsibilities shall be allowed time off work, without pay, for meetings, conferences, training programs and other activities authorized by Local 2. Leaves will be granted with proper notice for reasonable periods of time on receipt of official requests from Local 2.

## SECTION 47. HEALTH AND SAFETY

The Employer shall maintain the establishment in safe and healthful conditions in accordance with the law. The Employer shall post health and safety regulations, including fire safety information and evacuation procedures, in an area readily accessible to all employees. The Employer and employee shall fully comply with all state and/or federal regulations regarding health and/or safe working conditions and will provide for the health and safety of the employees through the use of appropriate safety devices and safeguards. During an OSHA inspection, an authorized representative of Local 2 shall have the right to participate in said inspection.

## SECTION 48. AUTOMATION

In the event of a reduction of work force by reason of the introduction of new equipment or a change in methods of operation, existing employees, if qualified, shall be retained in such jobs as remain or are created in accordance with their seniority standing. The Employer shall be required to retrain employees, if qualified, in the event that training is necessary to qualify them for the operation of new equipment.

## SECTION 49. UNIFORMS, LINENS AND TOOLS

### 49.1 Cooks

(a) All uniforms and linen worn by the employees while working shall be supplied, cleaned and laundered by the Employer without cost to the employee.

(b) If for any reason the uniforms or linens are not furnished, laundered or cleaned by the Employer, the Employer shall pay the employee in addition to the regular compensation, as follows: $1.50 per day.

(c) The Employer shall furnish each employee no less than two (2) pairs of cook's uniform pants per week. In the event that the Employer does not furnish cook's pants, they shall be supplied by the cooks and the Employer shall pay to the employee the cost of laundering same plus $1.00 depreciation.

(d) All employees are entitled to at least one (1) clean uniform each day, which shall include a cook's hat and coat.

### 49.2 Dining Room

(a) The Employer shall furnish linens and uniforms and launder or clean same without cost to the employee.

(b) If for any reason the uniforms and linens are not furnished and laundered or cleaned by the Employer, the Employer shall pay to the employee in addition to the regular compensation for the Employer's failure to either furnish and/or launder as follows: $1.25 per day.

This shall not apply to Extra Food or Cocktail Servers.

(c) Any employee not supplied with dress coats or tuxedos and required by the Employer to wear dress coats, tuxedos, or other special coats in performance of their duties shall be paid for depreciation, maintenance and cleaning in addition to their regular wages as follows: $1.50 per day.

(d) Head Servers, Captains, Host Persons, Cashiers and Checkers not supplied with uniforms and required to wear their own apparel in performance of their duties shall be compensated for depreciation, cleaning and maintenance in addition to their regular wages as follows: $1.30 per day.

(e) A reasonable deposit may be required as security for the return of the uniforms furnished by the Employer upon issuance of a receipt to the employee for such deposit. All uniforms furnished by the Employer shall be returned at the time of termination.

### 49.3    Bar

The Employer shall furnish, launder and maintain at no cost to the employee, all uniforms and linens, which uniform shall consist of a jacket or special uniform. If the Employer does not furnish an employee with such uniform, the employee so effected shall receive the following sum for each day for which a uniform is not furnished:   $1.50 per day.

### 49.4    Miscellaneous

(a)   The Employer agrees to furnish, clean, launder and maintain for all employees all uniforms and linens or tools that are used in the service by the employee. Such uniforms, linens or tools shall remain the property of the Employer at all times.

(b)  All employees are entitled to at least one (1) clean uniform and apron each day.

(c)  Gloves and/or water repellent apron to be furnished on employees request.

(d)  If for any reason the uniforms or linens are not furnished by the Employer, the Employer shall pay the employee in addition to the regular compensation a daily sum as follows: $2.00 per day.

49.5    Payment.  The Employer may pay Uniform, Linen and Tool Allowances by separate check. The value of the aforesaid allowances shall not be taxed or included in taxable income.

49.6    Special Uniforms.  Any special uniform for servers shall be provided by the Employer.

## SECTION 50.  CRAFT RULES

### 50.1    Contributions

(a)  No employee shall be required or knowingly be permitted to contribute to the Head Waiter, Head Waitress, Captain, Hostess or any employee, but bus persons. The Union agrees to notify top management of any violation of this section and top management will then take appropriate action. It is understood that this section does not apply to Head Waiters, Head Waitresses, or Captains who work with the servers in serving the customers. If any employee continues to violate this section by demanding that any employee contribute to him or her, then such action may result in discipline or discharge.

(b)  Servers shall tip bus persons in accordance with the custom and tradition of the trade.

### 50.2    Cleaning

(a)  Except as modified by *Section 28 Relieving and Assisting*, Employees coming under the jurisdiction of the Kitchen Department - COOKS, shall not be required to do general cleaning other than the tools of the trade and the necessary cleaning of the immediate station.

(b) Except as modified by *Section 28 Relieving and Assisting*, servers shall not do any janitorial work, cleaning or polishing of silver or urns, or wash dishes or glasses. Servers shall perform only such services as are customarily performed by their craft. They shall not be required to make coffee in large coffee urns, do vegetable work or pantry work. Servers shall not be required to do general cleaning.

50.3  Special Events. Non-tipped employees working a shift at 4:00 p.m. or later on New Year's Eve shall receive time and one-half (1-1/2) on their regular rate of pay for all such work.

50.4  Banquet Rules. The following rules shall apply to the operation of banquets and banquet employees:

(a) Breakfast, Luncheon and Tea beginning before 4:00 p.m. A server shall not be required to serve more than twenty (20) persons. When a server is required to serve over twenty (20) persons, they shall be paid in addition to the established wages for each additional person, 80c.

(b) Dinner Banquets and Evening Banquet. Servers shall be required to serve not more than fifteen (15) persons. When servers are required to serve over fifteen (15) persons they shall be paid in addition to the established wages for each additional person, 80c.

(c) When banquet servers are required, the Union shall be notified at least forty-eight (48) hours in advance of the number required, unless the fact that such servers would be required was not known to the establishment forty-eight (48) hours in advance.

(d) Days Off. Banquet servers shall receive two (2) days off each week. The individual banquet server may elect the option of either fixed (regularly scheduled) or flexible (vary according to business) days off.

(e) Workday. A banquet server's shift may consist of any combination of breakfast, lunch and dinner/evening shifts not to exceed a total of eight (8) straight-time hours within any twelve (12) hour period. No less than eight (8) hours shall elapse between the end of one work day of the employee and the next. This shall not prohibit the performance of overtime work consecutive with the shift completed.

(f) Choice of Parties:

1. The steady banquet food server seniority list shall be numbered. A copy of the current list is attached.

2. The choice of parties in order of seniority is to be granted odd numbered employees and even numbered employees on alternating payroll weeks for one-half only of available servers' position designated by management for each party. Parties requiring an odd number of employees shall be handled as follows: ARA shall have the right to assign to parties requiring one server only and two of the servers at parties requiring three. Employees shall have the right to choose the odd or extra place on parties requiring five, seven, nine, etc., servers. That is, employees shall be entitled to select one more position than management may assign on parties requiring an odd number of servers in excess of three.

3. The choice of a party must be exercised no later than at the end of Banker's Club lunch shift the day before the party for parties Monday-Friday and at the end of a Banker's Club lunch shift

on Friday for weekend parties. No switches to be made by employees after choice is made. In the event a party cancels, employees who chose or were assigned to work it shall be assigned to another party in a manner so that senior employees are not laid off while less senior employees work. If a server is not working a Banker's Club lunch, his choice of a party must be communicated to the Banquet Manager, his assistant or the Union Shop Steward.

4. It is recognized that staffing (servers) needs may change and that more servers, or a different combination may be required to best serve the party in management's discretion, which may result in last minute changes. Management will not abuse the system by unnecessary last minute staffing changes or bumping. Management therefore retains the right to override an employee's choice on any given day with reasonable advance notice and assign an employee to a particular party to meet its business needs. However, in such an event, an employee "bumped" from his/her chosen party will have a right to exercise that lost choice of a party on any day of the immediately succeeding payroll week and the exercise of the "bumped" employee's choice of party shall be superior to that of the odd or even numbered group of employee's choice of party provided for in Paragraph 2.

5. The positions of the seniority list are numbered, not individuals. Hence, as employees' move up the list, their number may change from odd or even.

    Employees bear the risk of a change in the week in which they exercise their right to choose a party.

6. Subject to the limitations and terms set forth herein, the Employer shall continue to assign servers as it sees fit to best meet its business needs. In so doing, it will attempt to equalize the earning potential of employees. The Employer shall not discriminate against any server in the assignment of parties.

7. The Union retains the right to complain of and grieve under the collective bargaining agreement Employer assignment of servers which it believes is discriminatory or unfair.

    (g) Banquet Gratuities:

1. In arranging all banquets, buffets, receptions, cocktail parties, presold tours and private parties where a function sheet is created, a guaranteed minimum service charge in the amount of fifteen percent (15%) shall be added to the total food and beverage check. Seventy-five percent (75%) of the total gratuity and/or service charge shall be distributed to the Servers and Bus Persons working the banquet and the remaining twenty-five percent (25%) shall be distributed, at the Employer's discretion. Effective September 1, 1998 seventy-five percent (75%) of fifteen and one-half percent (15 1/2%) shall be distributed to the Servers and Buspersons working the banquet, and the remaining twenty-five percent (25%) shall be distributed at the Employer's discretion. Effective September 1, 1999 seventy-five percent (75%) of sixteen percent (16%) shall be distributed to the Servers and Buspersons working the banquet, and the remaining twenty-five percent (25%) shall be distributed at the Employer's discretion.

    When an engager specifies an additional gratuity for an employee and this gratuity exceed the fifteen percent (15%) required service charge, such specified gratuity will be included in the service charge distribution referred to above. The Employer shall be responsible for and shall guarantee the distribution of said service charge and all banquet gratuities received in accordance with this rule.

2. Each banquet check given to the engager for signature shall provide a place for indicating the total amount of the gratuity and for verification thereof by the engager or guest authorized to sign the check. Each such banquet check shall so specify the total amount of the gratuity.

3. All gratuities for Servers, Bus Persons and others shall be made by the Employer to the employees entitled thereto in accordance with the customary practice.

4. The Employer shall be responsible for maintaining complete records of all banquets given; including all gratuities and/or service charges received or distributed and the actual banquet checks. Such records for each banquet shall be kept for at least one (1) year, and all such records shall be made available to the Union upon request at any time during business hours. Should the Employer fail or refuse to furnish the Union with the records as provided herein, the Union shall then make such request in writing. A penalty in the amount equal to ten percent (10%) shall be added and charged to the Employer for each week or fraction thereof after the elapse of a ten (10) day period for which he has refused or failed to make available such records to the Union as required herein.

5. Payment of Gratuities:

(a) Gratuities paid by charge accounts, credit cards, diner's clubs, etc., shall be paid to the employee or employees at the completion of their shift. This shall not apply to banquets; banquet gratuities will be paid on the paycheck for the pay period that the banquet was held.

(b) If, due to the failure of an employee to properly process a credit card because of an expired card or a non-imprinted card and the bill is uncollected, the amount of the tip shall be refunded to the Employer. In the event said bill is later collected, the tip shall be returned to the Server.

(c) Ala carte parties of six (6) or more shall have an automatic gratuity charge of fifteen percent (15%) added to all food and beverage checks. In the event that a guest complains about the service and in a reasonable period of time that the service did not justify the automatic gratuity, then the company may waive the automatic gratuity for that particular party.

## SECTION 51. NIGHT SHIFT PREMIUMS

All night shift premiums paid to employees hired prior to 9/1/84 shall continue to be paid as specified below. If an employee hired prior to 9/1/84 transfers to a night shift the premium shall apply.

(a) Miscellaneous Kitchen Department. Night shifts starting between the hours of 7:00 p.m. and up to 12 midnight shall be paid as follows: $1.25 per day.

(b) Combination Bus Person and Dishwasher. For Combination bus person and dishwasher, any shift beginning after 7:00 p.m. or before 4:00 a.m. shall be paid as follows: $1.50 per day.

## SECTION 52. DEFINITIONS

(a) Cashiers/Checkers

1. Cashiers/Checkers confined to a small work area and who are required to stand to perform their duties shall be provided with suitable stools and/or chairs for use.

2.  The Employer shall provide cashiers with efficient, functioning equipment to work with and shall maintain all equipment.

3.  All cashiers shall be allowed sufficient work time to set up and complete their work and close their station.

4.  Missing checks shall be brought to the attention of the Server to whom they were issued and the cashier(s) handling the checks within seventy-two (72) hours of the date of issue, not including Saturdays, Sunday, Holidays and Server's day off.

5.  Cashier duties shall be limited to accepting payment for guest checks, answering the telephone(s), making change, posting check and tip information and totaling and paying Server tips.

   (b)  Cooks

1.  All Around Cooks.  At least one all-around cook must be recognized and paid as such in any house open for more than ten (10) hours a day, where two (2) cooks or more are employed.

2.  All Other Cooks. Cooks of this classification need not be under the supervision of a Chef. They may perform all of the skilled tasks required in the art of cooking, including but not limited to soups, fish, cold meats, salads, carvers, etc.

3.  All cooks whose shifts commence at 4:00 p.m. or later shall receive not less than the night cook's rate of pay provided for in the wage schedules.

   (c)  Head Bartenders.  Head Bartenders are subject to all work rules governing bartenders. Head Bartenders can tend bar in accordance with their seniority. It is understood that the Beverage Manager shall not tend bar except in case of emergency and shall not displace bargaining unit employees.

   (d)  Head Bus Person.  Any bus person required by the Employer to supervise other bus persons, make out a work schedule, etc., shall be classified as Head Bus Person.

## SECTION 53. TERM AND REOPENING OF AGREEMENT

This Agreement shall become effective September 1, 1997 and shall remain in full force and effect until August 31, 2002 with a Wage and Benefits Reopener in August 2000 and shall otherwise be automatically renewed from year to year unless either party shall serve written notice on the other party of a desire to alter, amend, or terminate said Agreement at least ninety (90) days prior to the expiration. In the event an agreement is not reached during the Wage and Benefit Reopener, either party may declare the contract expired and commence negotiations for a successor agreement.

**For the Union:**

Mike Casey, President

Date: 7/15/98

**For the Employer:**

Rob Gould, Director of Labor Relations

Date: 7/20/98

*opeiu-3-afl-cio(51)jy*

## ADDENDUM "A"

Classifications and Wages for Employees Hired By the Employer Prior to 9/1/84 or Employees Hired Prior to 9/1/84 Who Have At Least One (1) Year of Service with an Employer Covered By A Local Contract

## WAGE RATE GRANDFATHER CLAUSE.

Any employee in a specialized classification and/or receiving classification premium pay over those classifications specified herein, shall receive all negotiated increases on the seven and one-half (7-1/2) within eight (8) hour base rate. In addition, the employee shall receive the grandfathered premium pay and shall be classified under the appropriate classification set forth herein. Once an employee commences work he shall be paid for the full scheduled shift.

PREMIUMS:

A.    Included in shift rates:

    1.    Grandfathered short shift premiums

    2.    New Split-Shift premiums (where non-existent in 1981-1984 Agreement)

        Tipped employees:        $0.50 per hour
        Non-tipped employees:    $1.00 per hour

B.    Not included in shift rates and must be added:

    1.    Night shift premium (see *Section 52 Night Shift Premiums*)

The following shift rates shall reflect these negotiated increases:

## WAGES

|  | one time signing bonus for all Regular Employees Effective 9/1/97 *prorated if employed less than 1 year* | Effective 9/1/98 | Effective 9/1/99 |
|---|---|---|---|
| Servers, Bartenders and Buspersons | *$275 | 10¢/hr. increase | 15¢/hr. increase |
| Banker's /Club and Banquet Servers | $275 | 10¢/hr. increase | 10¢/hr. increase |
| Barbacks | $300 | 20¢/hr. increase | 25¢/hr. increase |
| Non-tipped | $325 | 30¢/hr. increase | 35¢/hr. increase |

* Bartenders shall receive the following for working portable bars:

| Effective 9/1/97 | Effective 9/1/98 | Effective 9/1/99 | Effective 9/1/00 |
|---|---|---|---|
| $60/shift | $62.50/shift | $65/shift | $70/shift |

| Classification | 9/1/95 | 9/1/96 | 9/1/98 | 9/1/99 |
|---|---|---|---|---|
| **-Class "A"-** | | | | |
| **Chef/Head Cook** | | | | |
| 7-1/2 in 8 hr. | 107.41 | 109.28 | 111.53 | 114.16 |
| 5-1/2 in 6 hr. | 84.05 | 85.42 | 87.07 | 89.00 |
| 4 hr. | 61.12 | 62.12 | 63.32 | 64.72 |
| **2nd Cook/1st Pastry Cook** | | | | |
| 7-1/2 in 8 hr. | 90.91 | 92.78 | 95.03 | 97.66 |
| 5-1/2 in 6 hr. | 70.90 | 72.27 | 73.92 | 75.85 |
| 4 hr. | 51.56 | 52.56 | 53.76 | 55.16 |
| **All Other Cooks, etc., except Night Cook** | | | | |
| 7-1/2 in 8 hr. | 85.28 | 87.15 | 89.40 | 92.03 |
| 5-1/2 in 6 hr. | 66.45 | 67.82 | 69.47 | 71.40 |
| 4 hr. | 48.32 | 49.32 | 50.52 | 51.92 |
| **1st Pantry Person** | | | | |
| 7-1/2 in 8 hr. | 80.78 | 82.65 | 84.90 | 87.53 |
| 5-1/2 in 6 hr. | 62.93 | 64.30 | 65.95 | 67.88 |
| 5 hr. | 57.20 | 58.45 | 59.95 | 61.70 |
| 4 hr. | 46.76 | 47.76 | 48.96 | 50.36 |
| **Dishwasher/Vegetable Person/Porter** | | | | |
| 7-1/2 in 8 hr. | 62.18 | 64.05 | 66.30 | 68.93 |
| 5-1/2 in 6 hr. | 45.49 | 46.86 | 48.51 | 50.44 |
| 5 hr. | 41.35 | 42.60 | 44.10 | 45.85 |
| 4 hr. | 35.12 | 36.12 | 37.32 | 38.72 |
| 3 hr. | 27.45 | 28.20 | 29.10 | 30.15 |
| 2 hr. | 21.76 | 22.26 | 22.86 | 23.56 |
| **Laundry** | | | | |
| 7-1/2 in 8 hr. | 62.18 | 64.05 | 66.30 | 68.93 |
| 4 hr. | 33.16 | 34.16 | 35.36 | 36.76 |

*9/1/97-8/31/2002*                    Davre's-Page 31

| Classification | 9/1/95 | 9/1/96 | 9/1/98 | 9/1/99 |
|---|---|---|---|---|
| **Supply** | | | | |
| 7-1/2 in 8 hr. | 62.94 | 64.81 | 67.06 | 69.69 |
| 7-1/2 in 12 hr. | 70.44 | 72.31 | 74.56 | 77.19 |
| 6 in 9 hr. | 58.85 | 60.35 | 62.15 | 64.25 |
| 5-1/2 in 6 hr. | 51.53 | 52.78 | 54.28 | 56.03 |
| 4 hr. | 34.86 | 35.86 | 37.06 | 38.46 |
| 3 hr. | 27.96 | 28.71 | 29.61 | 30.66 |
| **Maitre d'/Head Server** | | | | |
| 7-1/2 in 8 hr. | 73.21 | 74.33 | 75.08 | 76.21 |
| 7-1/2 in 12 hr. | 74.18 | 75.30 | 76.05 | 77.18 |
| **Captain** | | | | |
| 7-1/2 in 8 hr. | 64.36 | 65.48 | 66.23 | 67.38 |
| 7-1/2 in 12 hr. | 68.11 | 69.23 | 69.98 | 71.11 |
| 5-1/2 in 6 hr. | 49.46 | 50.28 | 50.83 | 51.66 |
| 5 hr. | 44.95 | 45.70 | 46.20 | 46.95 |
| 4 hr. | 35.56 | 36.16 | 36.56 | 37.16 |
| 3 hr. | 26.67 | 27.12 | 27.42 | 27.87 |
| **Host** | | | | |
| 7-1/2 in 8 hr. | 60.68 | 61.80 | 62.55 | 63.68 |
| 7-1/2 in 12 hr. | 64.13 | 65.25 | 66.00 | 67.13 |
| 6 hr. | 49.92 | 50.82 | 51.42 | 52.32 |
| 6 hr. in 9 hr. | 52.92 | 53.82 | 54.42 | 55.32 |
| 5 hr. | 40.65 | 41.40 | 41.90 | 42.85 |
| 4 hr. | 32.52 | 33.12 | 33.52 | 34.12 |
| 3 hr. or less | 26.34 | 26.79 | 27.09 | 27.54 |
| **Head Bartender** | | | | |
| 7-1/2 in 8 hr. | 86.48 | 87.60 | 88.35 | 89.48 |
| **Cage Bartender** | | | | |
| 7-1/2 in 8 hr. | 78.61 | 79.73 | 80.48 | 81.61 |
| 7-1/2 in 12 hr. | 82.36 | 83.48 | 84.23 | 85.36 |
| 5-1/2 in 6 hr. | 68.49 | 69.31 | 69.86 | 70.69 |
| 5 hr. | 82.25 | 63.00 | 63.50 | 64.25 |
| 4 hr. | 49.80 | 50.40 | 50.80 | 51.40 |

| Classification | 9/1/95 | 9/1/96 | 9/1/98 | 9/1/99 |
|---|---|---|---|---|
| **All Other Bartenders** | | | | |
| 7-1/2 in 8 hr. | 74.93 | 76.05 | 76.80 | 77.93 |
| 7-1/2 in 12 hr. | 78.68 | 79.80 | 80.55 | 81.68 |
| 5-1/2 in 6 hr. | 68.37 | 69.19 | 69.74 | 70.57 |
| 5 hr. | 62.15 | 62.90 | 63.40 | 64.15 |
| 4 hr. | 49.72 | 50.32 | 50.72 | 51.32 |
| **Bar Person** | | | | |
| 7-1/2 in 8 hr. | 58.13 | 59.25 | 60.75 | 62.63 |
| 5 hr. | 38.75 | 39.50 | 40.50 | 41.75 |
| 4 hr. | 31.85 | 32.45 | 33.25 | 34.25 |
| 3 hr. | 26.50 | 28.95 | 27.55 | 28.30 |
| 2 hr. | 19.49 | 19.79 | 20.19 | 20.69 |
| **Banquet Bartenders** | | | | |
| 5 hr. | 69.95 | 70.70 | 71.20 | 71.95 |
| 4 hr. | 55.96 | 56.56 | 56.96 | 57.56 |
| 3 hr. | 41.97 | 42.42 | 42.72 | 43.17 |
| **Food Server (Cash House) C/R** | | | | |
| 7-1/2 in 8 hr. | 39.38 | 40.50 | 41.25 | 42.38 |
| 7-1/2 in 12 hr. | 43.66 | 44.78 | 45.53 | 46.66 |
| 6 hr. | 34.68 | 35.58 | 36.18 | 37.08 |
| 5 hr. (dinner) | 28.30 | 29.05 | 29.55 | 30.30 |
| 4 hr. | 25.60 | 26.20 | 26.60 | 27.20 |
| 3 hr. (lunch) | 21.51 | 21.96 | 22.26 | 22.71 |
| **Food Server (non-Cash House) B/C** | | | | |
| 7-1/2 in 8 hr. | 44.11 | 45.23 | 45.98 | 46.73 |
| 7-1/2 in 12 hr. | 48.09 | 49.21 | 49.96 | 50.71 |
| 6 hr. | 38.10 | 39.00 | 39.60 | 40.20 |
| 6 hr. in 9 hr. | 42.30 | 43.20 | 43.80 | 44.40 |
| 5 hr. (dinner) | 34.80 | 35.55 | 36.05 | 36.55 |
| 4 hr. | 27.84 | 28.44 | 28.84 | 29.24 |
| 3 hr. or less | 21.87 | 22.32 | 22.62 | 22.92 |
| 2 hr. (lunch) | 17.800 | 18.10 | 18.30 | 18.50 |

| Classification | 9/1/95 | 9/1/96 | 9/1/98 | 9/1/99 |
|---|---|---|---|---|
| **Food Server (Banquet)** | | | | |
| 5 hr. | 32.95 | 33.70 | 34.20 | 34.70 |
| 4 hr. | 26.36 | 26.96 | 27.36 | 27.76 |
| 3 hr. | 19.77 | 20.22 | 20.52 | 20.82 |
| **Beverage Attendant (Waiter)** | | | | |
| 7-1/2 in 8 hr. | 48.23 | 49.35 | 50.10 | 51.23 |
| 7-1/2 in 12 hr. | 57.73 | 58.85 | 59.60 | 60.73 |
| 5-1/2 in 6 hr. | 35.37 | 36.19 | 36.74 | 37.57 |
| 5 hr. | 32.15 | 32.90 | 33.40 | 34.15 |
| 4 hr. | 25.72 | 26.32 | 26.72 | 27.32 |
| 3 hr. | 19.29 | 19.74 | 20.04 | 20.49 |
| **Bus Person (Cash House)** | | | | |
| 7-1/2 in 8 hr. | 40.66 | 41.78 | 42.53 | 43.66 |
| 7-1/2 in 12 hr. | 44.61 | 45.73 | 46.48 | 47.61 |
| 6 hr. | 35.94 | 36.84 | 37.44 | 38.34 |
| 6 hr. in 9 hr. | 38.64 | 39.54 | 40.14 | 41.04 |
| 5 hr. (dinner) | 29.25 | 30.00 | 30.50 | 31.25 |
| 4 hr. | 26.60 | 27.20 | 27.60 | 28.20 |
| 3 hr. | 22.08 | 22.53 | 22.83 | 23.28 |
| 2 hr. | 14.72 | 15.02 | 15.22 | 15.52 |

Head Bus Person add 40¢ per hour

| Classification | 9/1/95 | 9/1/96 | 9/1/98 | 9/1/99 |
|---|---|---|---|---|
| **Bus Person (non-Cash House)** | | | | |
| 7-1/2 in 8 hr. | 45.38 | 46.50 | 47.25 | 48.38 |
| 7-1/2 in 12 hr. | 49.36 | 50.48 | 51.23 | 52.36 |
| 6 hr. | 39.24 | 40.14 | 40.74 | 41.64 |
| 6 hr. in 9 hr. | 43.56 | 44.46 | 45.06 | 45.96 |
| 5 hr. | 34.85 | 35.60 | 36.10 | 36.85 |
| 4 hr. | 27.88 | 28.48 | 28.88 | 29.48 |
| 3 hr. | 21.87 | 22.32 | 22.62 | 23.07 |
| 2 hr. | 17.80 | 18.10 | 18.30 | 18.60 |

### ADDENDUM "B"

Classifications and Wages for Employees Hired By the Employer After 9/1/84 Including Employees Who Did Not Have At Least One (1) Year of Service with an Employer Covered By A Local Contract Prior To 9/1/84.

| Classification | 9/1/95 | 9/1/96 | 9/1/98 | 9/1/99 |
|---|---|---|---|---|
| **-Class "A"-** | | | | |
| **Chef/Head Cook** | | | | |
| 7-1/2 in 8 hr. | 107.41 | 109.28 | 111.53 | 114.16 |
| 7-1/2 in 12 hr. | 114.91 | 116.78 | 119.03 | 121.66 |
| 5-1/2 in 6 hr. | 78.77 | 80.14 | 81.79 | 83.72 |
| 5 hr. | 71.60 | 72.85 | 74.35 | 76.10 |
| 4 hr. | 57.28 | 58.28 | 59.48 | 60.88 |
| **2nd Cook/1st Pastry Cook** | | | | |
| 7-1/2 in 8 hr. | 90.91 | 92.78 | 95.03 | 97.66 |
| 7-1/2 in 12 hr. | 98.41 | 100.28 | 102.53 | 105.16 |
| 5-1/2 in 6 hr. | 66.67 | 68.04 | 69.69 | 71.62 |
| 5 hr. | 60.60 | 61.85 | 63.35 | 65.10 |
| 4 hr. | 48.48 | 49.48 | 50.68 | 52.08 |
| **All Other Cooks, etc., except Night Cook** | | | | |
| 7-1/2 in 8 hr. | 85.28 | 87.15 | 89.40 | 92.03 |
| 7-1/2 in 12 hr. | 92.78 | 94.65 | 96.90 | 99.53 |
| 5-1/2 in 6 hr. | 62.54 | 63.91 | 65.56 | 67.49 |
| 5 hr. | 56.85 | 58.10 | 59.60 | 61.35 |
| 4 hr. | 45.48 | 46.48 | 47.68 | 49.08 |
| **1st Pantry Person** | | | | |
| 7-1/2 in 8 hr. | 80.78 | 82.65 | 84.90 | 87.53 |
| 7-1/2 in 12 hr. | 88.28 | 90.15 | 92.40 | 95.03 |
| 5-1/2 in 6 hr. | 59.24 | 60.61 | 62.28 | 64.19 |
| 5 hr. | 53.85 | 55.10 | 56.60 | 58.35 |
| 4 hr. | 43.08 | 44.08 | 45.28 | 46.68 |
| **All Other Pantry** | | | | |
| 7-1/2 in 8 hr. | 74.41 | 76.28 | 78.53 | 81.16 |
| 7-1/2 in 12 hr. | 81.91 | 83.78 | 86.03 | 88.66 |
| 5-1/2 in 6 hr. | 54.57 | 55.94 | 57.59 | 59.52 |
| 5 hr. | 49.60 | 50.85 | 52.35 | 54.10 |
| 4 hr. | 39.68 | 40.68 | 41.88 | 43.28 |
| 3 hr. | 29.76 | 30.51 | 31.41 | 32.46 |

| Classification | 9/1/95 | 9/1/96 | 9/1/98 | 9/1/99 |
|---|---|---|---|---|
| **Dishwasher/Porter** | | | | |
| 7-1/2 in 8 hr. | 62.18 | 64.05 | 66.30 | 68.93 |
| 7-1/2 in 12 hr. | 69.66 | 71.53 | 73.78 | 76.41 |
| 5-1/2 in 6 hr. | 45.60 | 46.97 | 48.62 | 50.55 |
| 5 hr. | 41.45 | 42.70 | 44.20 | 45.95 |
| 4 hr. | 33.16 | 34.16 | 35.36 | 36.76 |
| 3 hr. | 24.87 | 25.62 | 26.52 | 27.57 |
| 2 hr. | 16.58 | 17.08 | 17.68 | 18.38 |
| **Laundry** | | | | |
| 7-1/2 in 8 hr. | 62.18 | 64.05 | 66.30 | 68.93 |
| 4 hr. | 33.16 | 34.16 | 35.36 | 36.76 |
| **Supply** | | | | |
| 7-1/2 in 8 hr. | 62.94 | 64.81 | 67.06 | 69.69 |
| 7-1/2 in 12 hr. | 70.44 | 72.31 | 74.56 | 77.19 |
| 5-1/2 in 6 hr. | 46.16 | 47.52 | 49.17 | 51.10 |
| 4 hr. | 33.56 | 34.56 | 35.76 | 37.16 |
| 3 hr. | 25.17 | 25.92 | 26.82 | 27.87 |
| **Maitre d'/Head Server** | | | | |
| 7-1/2 in 8 hr. | 73.21 | 74.33 | 76.58 | 79.21 |
| 7-1/2 in 12 hr. | 76.96 | 78.08 | 80.33 | 82.96 |
| **Captain** | | | | |
| 7-1/2 in 8 hr. | 64.28 | 65.40 | 66.15 | 67.28 |
| 7-1/2 in 12 hr. | 68.16 | 69.28 | 70.03 | 71.16 |
| 5-1/2 in 6 hr. | 47.20 | 48.02 | 48.57 | 49.40 |
| 5 hr. | 42.90 | 43.65 | 44.15 | 44.90 |
| 4 hr. | 34.32 | 34.92 | 35.32 | 35.92 |
| 3 hr. | 25.74 | 26.19 | 26.49 | 26.94 |
| **Host** | | | | |
| 7-1/2 in 8 hr. | 60.68 | 61.80 | 64.05 | 66.68 |
| 7-1/2 in 12 hr. | 64.43 | 65.55 | 67.80 | 70.43 |
| 5-1/2 in 6 hr. | 44.50 | 45.32 | 46.97 | 48.90 |
| 6 hr. in 9 hr. | 51.54 | 52.44 | 54.24 | 56.34 |
| 5 hr. | 40.45 | 41.20 | 42.70 | 44.45 |
| 4 hr. | 32.36 | 32.96 | 34.16 | 35.56 |
| 3 hr. or less | 24.27 | 24.72 | 25.62 | 26.67 |

| Classification | 9/1/95 | 9/1/96 | 9/1/98 | 9/1/99 |
|---|---|---|---|---|
| **Head Bartender** | | | | |
| 7-1/2 in 8 hr. | 86.48 | 87.60 | 88.35 | 89.48 |
| 7-1/2 in 12 hr. | 90.23 | 91.35 | 92.10 | 93.23 |
| **Cage Bartender** | | | | |
| 7-1/2 in 8 hr. | 78.61 | 79.73 | 80.48 | 81.61 |
| 7-1/2 in 12 hr. | 85.61 | 86.73 | 87.48 | 88.61 |
| 5-1/2 in 6 hr. | 57.65 | 58.47 | 59.02 | 59.85 |
| 5 hr. | 52.40 | 53.15 | 53.65 | 54.40 |
| 4 hr. | 41.92 | 42.52 | 42.92 | 43.52 |
| **All Other Bartenders** | | | | |
| 7-1/2 in 8 hr. | 74.93 | 76.05 | 76.80 | 77.93 |
| 7-1/2 in 12 hr. | 77.96 | 79.08 | 79.83 | 80.96 |
| 5-1/2 in 6 hr. | 54.50 | 55.77 | 56.32 | 57.15 |
| 5 hr. | 50.45 | 51.20 | 51.70 | 52.45 |
| 4 hr. | 39.96 | 40.56 | 40.96 | 41.56 |
| **Food Server (Cash House) C/R** | | | | |
| 7-1/2 in 8 hr. | 39.38 | 40.50 | 41.25 | 42.38 |
| 7-1/2 in 12 hr. | 43.13 | 44.25 | 45.00 | 46.13 |
| 5-1/2 in 6 hr. | 28.88 | 29.70 | 30.25 | 31.08 |
| 5 hr. (dinner) | 26.25 | 27.00 | 27.50 | 28.25 |
| 4 hr. | 21.00 | 21.60 | 22.00 | 22.60 |
| 3 hr. (lunch) | 15.75 | 16.20 | 16.50 | 16.95 |
| 2 hr. | 10.50 | 10.80 | 11.00 | 11.30 |
| **Bar Person** | | | | |
| 7-1/2 in 8 hr. | 58.13 | 59.25 | 60.00 | 61.13 |
| 7-1/2 in 12 hr. | 65.63 | 66.75 | 67.50 | 68.63 |
| 5 hr. | 38.88 | 39.70 | 40.25 | 41.08 |
| 4 hr. | 31.00 | 31.60 | 32.00 | 32.60 |
| 3 hr. | 23.25 | 23.70 | 24.00 | 24.45 |
| 2 hr. | 15.50 | 15.80 | 16.00 | 16.30 |
| 4 hr. | 25.60 | 26.20 | 26.60 | 27.20 |
| 3 hr. (lunch) | 21.51 | 21.96 | 22.26 | 22.71 |

| Classification | 9/1/95 | 9/1/96 | 9/1/98 | 9/1/99 |
|---|---|---|---|---|
| **Food Server (non-Cash House) B/C** | | | | |
| 7-1/2 in 8 hr. | 44.11 | 45.23 | 45.98 | 46.73 |
| 7-1/2 in 12 hr. | 48.09 | 49.00 | 49.96 | 50.71 |
| 6 hr. | 38.10 | 39.00 | 39.60 | 40.20 |
| 6 hr. in 9 hr. | 42.30 | 43.20 | 43.80 | 44.40 |
| 5 hr. (dinner) | 34.80 | 35.55 | 36.05 | 36.55 |
| 4 hr. | 27.84 | 28.44 | 28.84 | 29.24 |
| 3 hr. or less | 21.87 | 22.32 | 22.62 | 22.92 |
| 2 hr. (lunch) | 17.80 | 18.10 | 18.30 | 18.50 |
| **Food Server (Banquet)** | | | | |
| 5 hr. | 32.95 | 33.70 | 34.20 | 34.70 |
| 4 hr. | 26.36 | 26.96 | 27.36 | 27.76 |
| 3 hr. | 19.77 | 20.22 | 20.52 | 20.82 |
| **Beverage Attendant (Waiter)** | | | | |
| 7-1/2 in 8 hr. | 48.23 | 49.35 | 50.10 | 51.23 |
| 7-1/2 in 12 hr. | 57.73 | 58.85 | 59.60 | 60.73 |
| 5-1/2 in 6 hr. | 35.37 | 36.19 | 36.74 | 37.57 |
| 5 hr. | 32.15 | 32.90 | 33.40 | 34.15 |
| 4 hr. | 25.72 | 26.32 | 26.72 | 27.32 |
| 3 hr. | 19.29 | 19.74 | 20.04 | 20.49 |
| **Bus Person (Cash House)** | | | | |
| 7-1/2 in 8 hr. | 40.66 | 41.78 | 42.53 | 43.66 |
| 7-1/2 in 12 hr. | 44.61 | 45.73 | 46.48 | 47.66 |
| 6 hr. | 35.94 | 36.84 | 37.44 | 38.34 |
| 6 hr. in 9 hr. | 38.64 | 39.54 | 40.14 | 41.04 |
| 5 hr. (dinner) | 29.25 | 30.00 | 30.50 | 31.25 |
| 4 hr. | 26.60 | 27.20 | 27.60 | 28.20 |
| 3 hr. | 22.08 | 22.53 | 22.83 | 23.28 |
| 2 hr. | 14.72 | 15.02 | 15.22 | 15.52 |
| Head Bus Person add 40¢ per hour | | | | |
| **Bus Person (non-Cash House)** | | | | |
| 7-1/2 in 8 hr. | 45.38 | 46.50 | 47.25 | 48.38 |
| 7-1/2 in 12 hr. | 49.36 | 50.48 | 51.23 | 52.36 |
| 6 hr. | 39.24 | 40.14 | 40.74 | 41.64 |
| 6 hr. in 9 hr. | 43.56 | 44.48 | 45.06 | 45.96 |
| 5 hr. | 34.85 | 35.60 | 36.10 | 36.85 |
| 4 hr. | 27.88 | 28.48 | 28.88 | 29.48 |
| 3 hr. | 21.87 | 22.32 | 22.62 | 23.07 |
| 2 hr. | 17.80 | 18.10 | 18.30 | 18.60 |

## ADDENDUM "C"

### Training and Apprenticeship Programs

1.  Training Program

    (a)  New Hires

    For all new employees with no previous experience in the classification, the following wage rates may be used:

    1st 6 weeks......................................60% of hourly classification rate
    2nd 6 weeks.....................................70% of hourly classification rate
    3rd 6 weeks......................................80% of hourly classification rate
    4th 6 weeks......................................90% of hourly classification rate
    Thereafter........................................100% of hourly classification rate

    Under no circumstances shall the Employer pay less than minimum wage.

    (b)  Promotional

    An Employer may upgrade an employee within the establishment from a "lower" classification to a "higher" classification, and for a period of ninety (90) days the wage rate for said employee shall be 80% of the higher classification, but not lower than the employee's current rate. The Union shall be notified in writing prior to such upgrading. Should the employee not work out in the higher classification said employee shall be given the opportunity to return to the former job.

2.  Apprenticeship Programs

    (a)  Cooks

    Apprentices shall be employed in accordance with the apprenticeship standards of the San Francisco Restaurant Industry Cooks Joint Apprenticeship and Training Committee agreed to with the California State Division of Apprenticeship Standards, between Hotel Employees and Restaurant Employees Union, Local 2, and the Golden Gate Restaurant Association, and shall be paid the following percentages of the "Second Cook" wages in Class A restaurants as set forth in *Addendum "B"*:

    1st  12  months...............................55%
    2nd  12  months..............................70%
    3rd  12  months...............................90%

    (b)  Bartenders

    Apprentices shall be employed in accordance with the Apprenticeship Standards of the San Francisco Restaurant Industry Bartender Joint Apprenticeship and Training Committee agreed

to with the California State Division of Apprenticeship Standards between Hotel Employees and Restaurant Employees Union, Local 2, and the Golden Gate Restaurant Association and shall be paid the following percentages of the "All Other Bartenders" wages as set forth in *Addendum "B"*.

1st  6  months................................65%
2nd  6  months................................80%
3rd  6  months................................90%

## ADDENDUM "D"

### Supplemental Vacation Benefit Plan

Pursuant to Section II-B-3 of the Agreement of October 17, 1962, the parties have agreed upon a plan of other supplemental benefits within the meaning of said section which shall be payable from the supplementary benefit fund (hereinafter called the Fund) established and maintained pursuant to Section A-3(a) of said Agreement. This said plan of other supplemental benefits hereinafter set forth is intended to supplement the vacation benefits provided by the collective bargaining agreements between the parties and except as specifically provided herein, this said plan of benefits shall not affect or vary the terms of said collective bargaining agreements with respect to vacations.

1. For the purpose of this plan of supplemental vacation benefits, "Employer" shall mean an Employer party to a collective bargaining agreement with the Union from whom contributions are due the Fund on behalf of the employees covered by said collective bargaining agreement. "Employee" shall mean an employee of the Employer entitled to receive a vacation under said collective bargaining agreement. "Industry shall mean all hotels, motels, restaurants, clubs and other establishments providing food, beverages and/or lodging to the public which are covered by collective bargaining agreements with the Union requiring the contributions to the Fund herein provided. "Unions" shall mean the Hotel Employees and Restaurant Employees Union, Local 2, and Service Employees Union, Local 14, signatory to the Agreement of October 17, 1962.

2. Once an employee has established eligibility for three (3) weeks vacation under a collective bargaining agreement between an Employer and the Unions, said employee, upon changing jobs in the industry, shall be entitled to receive from the Fund, after one year of service with any new Employer, two (2) weeks' vacation pay.

3. Upon the establishment of eligibility for the supplemental vacation benefit from the Fund as provided in Paragraph 2 hereof, said employee shall thereafter remain entitled to such vacation benefit from the fund after each year of service with any Employer in the industry.

4. Payments hereunder shall be subject to such deductions as may be required by law.

### Rules For Vacation Fund Payments
### On Purchase Of Existing Business

I. On the sale of a business in the industry covered by a Collective Bargaining Agreement between an Employer and the Unions where an employee has 8 or 18 years, as the case may be, seniority with that same Employer, the selling Employer shall pay all pro-rated vacation pay, whether for 1, 2, 3, 4 weeks' pro-rated vacation pay, as the case may be, to the Industry Vacation Plan.

II. All employees continuing with the buying Employer shall maintain their same existing employment anniversary date.

    A) A continuing employee entitled to a 1 or 2 week vacation on the sale date shall concurrently receive at the time of eligibility for the next vacation period following such sale, vacation pay as follows:

1. From the Vacation Fund the amount previously paid to the Fund by the selling Employer; and

2. From the buying Employer the remaining pro-rated portion of the one or two weeks' vacation pay.

B) Thereafter, any continuing employee entitled to either a one or two week vacation from the buying Employer shall receive vacation pay directly from the Employer.

C) A continuing employee entitled to a 3 or 4 week vacation on the sale date shall concurrently receive at the time of eligibility for the next vacation period following such sale, vacation pay as follows:

1. From the Vacation Fund the pro-rated amount previously paid to the Fund by the selling Employer for the first and second weeks of vacation pay and, as the case may be, the third, or third and fourth weeks of vacation pay; and

2. From the buying Employer the remaining pro-rated portion of the first two weeks of vacation pay.

D) Thereafter, any continuing employee entitled to either a 3 or 4 week vacation from the buying Employer shall receive the first two weeks of vacation pay directly from the Employer and either the third, or the third and fourth weeks of vacation pay from the Fund.

III. There shall be a 30 day shape-up period commencing from the takeover by the buying Employer during which all employees may be evaluated by the buying Employer and during this period the Unions will permit discharge of employees who are not able to shape-up. This does not apply to employees where the employee feels and is found to be discharged because of Union activities.

IV. All employees who do not remain with the buying Employer and change employment within the industry for any reason must work at the new location within the Industry for one year to become eligible to receive the third, or the third and fourth weeks vacation pay from the Fund.

Such employee at the new job location within the Industry shall work one year with the new Employer to be eligible for one week vacation from the Employer and two years with the Employer to be eligible for two weeks vacation from the Employer.

V. No employee shall receive vacation pay from the Vacation Fund without taking actual full vacation time off from the job.

VI. Where a continuing employee remains with the buying Employer during any part of the 30 day shape-up period or thereafter, the buying Employer shall be responsible to see that all pro-rated vacation pay of the selling Employer is paid to the Vacation Fund for such employee, and in the event it is not so paid the buying Employer shall pay the full vacation pay or any pro-rata vacation pay when due directly to the employee.

Where the pro-rata vacation pay is not paid to the Fund, the Fund shall pay only such amount it would have paid if said pro-rata vacation pay was paid to the Fund.

This provision shall not apply where an employee does not enter the employ of the buying Employer.

*ADDENDUM  "E"*

## Supplemental Sick Leave Benefit Plan

Pursuant to Section II-B-2 of the Agreement of October 17, 1962, the parties have agreed upon a plan of supplemental sick leave benefits as hereinafter set forth, the cost of which shall be payable from the supplemental disability fund (hereinafter called Fund) established and maintained pursuant to Section I-A-2ii of said Agreement. The said plan of benefits herein set forth is amendatory to the sick leave benefits provided by the collective bargaining agreements between the parties, and shall vary the terms of said collective bargaining agreements with respect to sick leave only as provided herein. It is the intent of this Supplemental Sick Leave Benefit Plan to transfer responsibility for the direct payment of such sick leave in excess of four days per year for any employee from the Employer contributor to the Fund.

1. For the purpose of this plan of supplemental sick leave benefits, "Employer" shall mean an Employer party to a collective bargaining agreement with the Unions from whom contributions are due the Fund on behalf of the employees covered by said collective bargaining agreement. "Employee" shall mean an employee of an Employer entitled to receive sick leave benefits under said collective bargaining agreement by reason of illness or disability. "Industry" shall mean all hotels, motels, restaurants, clubs and other establishments providing food, beverages and/or lodging to the public which are covered by collective bargaining agreements with the Unions requiring the contributions to the Fund herein provided. "Unions" shall mean the Hotel Employees and Restaurant Employees Union, Local 2, and Service Employees Union, Local 14, signatory to the Agreement of October 17, 1962.

2. Any employee who has been employed in the industry by one Employer for more than one (1) year shall be entitled thereafter, in case of illness, to one (1) day's sick leave for each month worked, but not to exceed two (2) days' sick leave per employment year. Any employee who has been employed in the industry by the Employer for more than five (5) years shall be entitled thereafter, in case of illness, to one (1) day's sick leave for each month worked, but not to exceed five (5) days' sick leave per employment year. Any employee who has been employed in the industry by one Employer for more than eight (8) years shall be entitled thereafter, in case of illness, to one (1) days' sick leave for each month worked, but not to exceed eight (8) days' sick leave per employment year. Any employee who has been employed in the industry by one Employer for more than fifteen (15) years shall be entitled thereafter, in case of illness, to one (1) days' sick leave for each month worked, but not to exceed thirteen (13) days' sick leave per year. Provided, however, that unused sick leave shall not accumulate from year to year except that each year after fifteen (15) years of employment an employee shall be able to carry over four (4) days' of unused sick leave each year not to exceed a total sick leave accumulation of twenty-one (21) days. Provided further that said additional sick leave provided under this paragraph shall not commence until the four (4) days of the employee's sick leave otherwise earned under the collective bargaining agreement is exhausted.

3. Once an employee has established eligibility for sick leave benefits from the Fund under Paragraph 18 hereof, said employee shall remain entitled to such sick leave benefits from the Fund so long as the employee remains employed in the industry, regardless of the length of employment with any particular Employer. This shall mean that upon any change of employment in the industry, such an eligible employee shall, in addition to any unused portion of sick leave benefits earned by previous employment be entitled to receive from the

Fund in case of illness or disability, one (1) days' sick leave for each month worked for the new Employer; but in no event shall such an employee be entitled to receive more than seventeen (17) days' sick leave per year from the Fund.

4. The Trustees of the Fund may require an employee to submit a certificate or notification from a doctor as proof of illness or disability before paying sick benefits hereunder.

5. Sick leave shall be integrated with Unemployment Compensation Disability Benefits or Workers' Compensation Benefits so that the sum of the disability sick leave pay allowable hereunder and the said Benefits which can be paid to an employee during a week in which the employee is absent from work for reasons of illness or disability, shall not exceed one hundred percent (100%) of the employee's regular weekly take home pay for said week.

6. Payments hereunder shall be subject to such deductions as may be required by law.

### ADDENDUM "F"

### Checkoff Agreement

1. Pursuant to Section 3.3 of the Agreement between the Union and the Employer, it is agreed that the Employer shall, during the term of this Agreement, deduct each month Union membership dues, initiation fee and assessments from the pay of those employees who have authorized such deduction in writing as provided in this Checkoff Agreement. Such membership dues, initiation fee and assessments shall be limited to amounts levied by the Union in accordance with its Constitution and By-Laws. Deductions shall be made only for those employees who voluntarily submit to the restaurant employing them a written authorization in accordance with the "Authorization for Checkoff of Dues, Initiation Fee and Assessments" form set forth below. It is the Union's responsibility to provide the employee with this form.

2. The required authorization shall be in the following form:

PAYROLL DEDUCTION AUTHORIZATION

Date_____

    I, the undersigned, a member of _____hereby request and voluntarily authorize the Employer to deduct from any wages or compensation due me, the regular monthly union dues, initiation fee and/or assessments uniformly applicable to the members in accordance with the Constitution and By-Laws of the Union.

    This authorization shall remain in effect and shall be irrevocable unless I revoke it by sending written notice to both the Employer and the Union by registered mail during a period of fifteen (15) days immediately succeeding any yearly period subsequent to the date of this authorization or subsequent to the date of termination, of the applicable contract between the Employer and the Union, whichever occurs sooner, and shall be automatically renewed as an irrevocable checkoff from year to year unless revoked as herein provided.

    Signed_____
    Social Security No._____

3. Deductions shall be made only in accordance with the provisions of said Authorization for Checkoff Dues, Initiation Fee and/or Assessments, together with the provisions of this Checkoff Agreement.

4. A properly executed Authorization for Checkoff Dues, Initiation Fee and/or Assessments form for each employee for whom Union membership dues are to be deducted hereunder, shall be delivered to the Employer before any payroll deductions are made. Deductions shall be made thereafter only under Authorization for Checkoff of Dues, Initiation Fee and/or Assessment forms which have been properly executed and are in effect. Any Authorization for Checkoff of Dues, Initiation Fee and/or Assessments form which is incomplete or in error will be returned to the Union by the Employer.

5. Checkoff deductions under all properly executed Authorization for Checkoff of Dues, Initiation Fee and/or Assessment forms which have been delivered to the Employer on or

before the fifteenth (15th) day of any particular month thereafter shall begin with the following calendar month.

6. Deductions shall be made in accordance with the provisions of this Checkoff of Union Membership Dues, Initiation Fee and/or Assessments section, from the pay received on the first payday of each month regardless of the payroll period ending date represented on that payroll check. These provisions for Dues, Initiation Fee and/or Assessments shall not apply to Banquet Workers or Extra Employees as defined in the current Agreement.

7. The Employer agrees to make deductions as otherwise provided in this Checkoff Union Membership Dues, Initiation Fee and/or Assessments section in the case of employees who have returned to work after an authorized leave of absence.

8. In cases where a deduction is made which duplicates a payment already made to the Union by an employee, or where a deduction is not in conformity with the provisions of the Union Constitution and By-Laws, refunds to the employee will be made by the Union.

9. The Employer shall remit each month to the designated financial officer of the Union, the amount of deduction made for that particular month, together with a list of employees and their social security numbers, for whom deductions have been made. The remittance shall be forwarded to the above designated financial officer not later than the 15th of the month, for the deduction from the first paycheck received by the employee (prior to the 15th of the month) for the month the Dues, Initiation Fee and/or Assessments are being paid.

10. Any employee whose seniority is broken by death, quit, discharge or layoff, or who is transferred to a position outside of the scope of the bargaining unit, shall cease to be subject to checkoff deductions beginning with the month immediately following that in which such deaths, quit, discharge, layoff or transfer occurred.

11. In the event any employee shall register a complaint with the Employer alleging his Dues, Initiation Fee and/or Assessments are being improperly deducted, the Employer will make no further deductions of the employee's Dues, Initiation Fee and/or Assessments. Such dispute shall then be reviewed with the employee by a representative of the Union and a representative of the Employer.

12. The Employer shall not be liable to the Union by reason of the requirements of this Checkoff Agreement for the remittance of payment of any sum other than that constituting deductions made from employee wages earned.

13. The Union shall indemnify, defend and save the Employer harmless against any and all claims, demands, suits or other forms by the Employer in reliance upon payroll deduction authorization cards submitted to the Employer.

## ADDENDUM "G"

### ARA Service: Bank America Units

The following positions are exempt under the terms of this Collective Bargaining Agreement. However it is understood that they may perform bargaining unit work in accordance with the past practice:

General Manager, ARA Services
Assistant Manager, ARA Services
Assistant Manager, Bankers Club
Assistant Manager, Bankers Breakfast Club
Catering Manager
Assistant Catering Manager
Catering Coordinator
Beverage Manager
Wine Buyer and Assistant Beverage Manager
Cafeteria Manager
Concourse Kitchen - Chef-Manager
Executive Chef
Bankers Club Chef
Carnelian Room Chef
Purchasing Manager
Night Manager All Operations
Chief Steward
Supervisor Dishwashers/Porters
Carnelian Room Maitre d'
Bankers Club Maitre d'
Breakfast Club Maitre d'
Laundry Supervisor
Manager Sales and Promotion and Advertising

*JM/opeiu-3-afl-cio(51)jy*

Exhibit  2

 **ARAMARK**

### APPLICATION FOR EMPLOYMENT

As an EQUAL EMPLOYMENT OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER, ARAMARK does not discriminate against applicants or employees because of their age, race, color, religion, national origin, sex (except where sex is a bonafide occupational qualification) or on any other basis prohibited by law. Furthermore, ARAMARK will not discriminate against any applicant or employee because he or she is mentally or physically disabled, a disabled veteran, or a veteran of the Vietnam era, provided he or she is qualified and meets the requirements established by ARAMARK for the job.

| PLEASE TYPE OR PRINT CLEARLY | DATE 9/6/05 |
|---|---|

| NAME (Last) | (First) | (Middle) | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| Foster | MARK | ANTOINE | 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 |

| CURRENT ADDRESS (Street) | (City) | (State) | (Zip Code) | PHONE NUMBER Area Code |
|---|---|---|---|---|
| 2300 Moonlight Terrace #A | Alameda | CA | 94502 | (415) 756-1611 |

| RESIDENT ADDRESS (Street) (if different from above) | (City) | (State) | (Zip Code) | PHONE NUMBER Area Code ( ) |
|---|---|---|---|---|

ARE YOU 18 YEARS OR OLDER?  ☑ YES   ☐ NO   IF NOT, STATE YOUR DATE OF BIRTH

---

### TYPE OF POSITION DESIRED

POSITION APPLIED FOR:
Banquet Cook/chef

☑ FULL TIME   ☐ PART TIME   ☐ SUMMER   ☐ TEMPORARY   ☐ OTHER

SALARY EXPECTED
$15 per hr

| WILL YOU RELOCATE? TO WHAT AREA? ☐ YES ☑ NO | WILL YOU TRAVEL? ☐ YES ☑ NO | DATE AVAILABLE TO WORK WITH ARAMARK Sept 10, 2005 |
|---|---|---|

| HAVE YOU EVER WORKED FOR ARAMARK? ☐ YES ☑ NO | IF YES, WHEN AND WHERE? |
|---|---|

| HAVE YOU EVER APPLIED TO ARAMARK? ☐ YES ☑ NO | IF YES, WHEN AND WHERE? |
|---|---|

To comply with the Immigration Reform and Control Act of 1986, if you are hired you will be required to provide documents to establish your identity and your authorization to be employed in the United States. Such documents will be required within the first three (3) business days following your hire, or upon your first work day if your employment period will be less than three (3) days.

HOW WERE YOU REFERRED TO ARAMARK?
FRIEND

ARE YOU WILLING TO TAKE A PHYSICAL EXAM AT OUR EXPENSE IF THE NATURE OF THE JOB REQUIRES ONE?   ☑ YES   ☐ NO

---

HAVE YOU EVER BEEN CONVICTED OF A CRIME (MISDEMEANOR OR FELONY)?   ☐ YES   ☑ NO

IF YES, EXPLAIN        (WHERE)        (WHEN)        (CHARGED)        (SENTENCE)

(Disclosure of a criminal record will not necessarily disqualify you for employment. Each conviction will be evaluated on its own merits with respect to time, circumstances and seriousness, in relation to the job for which you are applying.)

220-602U (2/97)

ARA/Fos
D 0004

This application shall only remain active for 60 days. After 60 days, if you are still interested in employment at ARAMARK, you must fill out a new application.

I hereby certify that all statements made in this application are true and correct to the best of my knowledge and belief. I understand and agree that any misrepresentation or omission of facts in my application may be justification for refusal to hire, or termination of employment.

I further understand that an investigative report may be made as to my character and general reputation. I authorize all past employers, schools, persons and organizations having relevant information or knowledge to provide it to ARAMARK or its duly authorized representative for its use in deciding whether or not to offer me employment and specifically waive any required written notification. I hereby release employers, schools, persons and organizations from all liability in responding to inquiries in connection with my application. Upon written request by me, within a reasonable period of time, ARAMARK will make available to me the nature and scope of all reports of every type obtained.

I understand that nothing contained in this employment application or in the granting of an interview is intended to create an employment contract between ARAMARK Corporation, its subsidiaries and affiliates, and me for either employment or for the providing of any benefit. If an employment relationship is established, I understand that my employment can be terminated, with or without cause, at the option of either ARAMARK or myself.

In signing this form, I certify that I understand all the questions and statements in this application.

Further, if granted a position with ARAMARK Corporation or any of its subsidiaries, I will comply with ARAMARK's Business Conduct Policy, a summary of which is printed below.

 ARAMARK

# BUSINESS CONDUCT POLICY

## THIS POLICY APPLIES WORLDWIDE

**Compliance with Laws**
It is ARAMARK's policy to comply with the laws in each country in which ARAMARK conducts business.

**Employment/Equal Opportunity**
ARAMARK's policy is to hire, promote, discipline and make all other personnel decisions without regard to race, color, religion, national origin, age, sex, disability, disabled veteran or Vietnam-era veteran status except where bona fide affirmative action programs allow for such considerations.

**Sexual Harassment**
Sexual harassment in any form will not be tolerated in the workplace. Any employee who feels that he or she has been subjected to sexual harassment is required to report the incident immediately.

**Illegal Substances**
It is ARAMARK's policy to maintain an environment free of drug and alcohol abuse.

**Environmental**
ARAMARK's policy is to comply with environmental laws in all countries in which ARAMARK conducts business.

**Collusion**
It is fundamental that ARAMARK independently determine the pricing, commissions and other contractual terms offered to clients or prospective clients.

**Copyright Infringement**
It is ARAMARK's policy to respect copyrights owned by others.

**Political Contributions**
Any political contribution or expenditure by a component is against ARAMARK policy. Also, any reimbursement of an employee for any such contribution or expenditure is against ARAMARK policy.

**Gifts and Entertainment**
It is ARAMARK's policy not to make any gift (other than a nominal holiday remembrance), or provide entertainment (except routine lunches or dinners during the conduct of regular business), to any government or union employee (except as provided in the Business Conduct Policy). Gifts given to non-government or non-union employees are restricted to a value of up to $200 (U.S.) per year; where entertainment is involved, lavish expenditures are to be avoided.

Gifts from any supplier or client to an ARAMARK employee may not total more than $200 (U.S.) per year.

**Accurate Books and Reporting**
All transactions must be accurately recorded. No unrecorded fund, asset, or other improper account of ARAMARK shall be established or maintained for any reason.

**Conflicts of Interest/Related Party Transactions**
It is essential that all ARAMARK employees avoid any situation or interest which might interfere with his/her judgment concerning responsibilities to ARAMARK.

**Outside Employment**
An ARAMARK employee's outside employment should not conflict with his/her responsibilities to ARAMARK.

**Finder's Fee**
Payment of finder's fees is prohibited without the written approval of the General Counsel's Office.

**Disclosure**
If you are aware of possible violations of the BUSINESS CONDUCT POLICY, you must report them to the BUSINESS CONDUCT POLICY SECRETARY c/o the Office of General Counsel, at Corporate Headquarters in writing or by telephoning 1-800-999-8989 extension 3248, or 215-238-3248, or to others listed in the policy booklet.

---

SIGNATURE OF APPLICANT                                          DATE

## FOR PERSONNEL USE ONLY

| DATE APPLICATION RECEIVED | REFERRAL SOURCE |
|---|---|
| INTERVIEWED BY | DEPARTMENT |

REFERENCE CHECK COMPLETED (DATE, AND BY WHOM)

DISPOSITION AND REASON

ARA/Fos
D 0005

**EXHIBIT 3**



**TEXT MESSAGES PLAINTIFF SENT TO DEFENDANT McVicker FROM
DECEMBER 1, 2004 TO THE PRESENT**

1) TAKE A DEEP BREATH WHAT HAPPENED WITH US STAYS WITH US IM
NOT OUT 2 DESTROY U, NOT MY STYLE

SENT FEBRUARY 7, 2006 08:33:53 PM FROM PLAINTIFF'S CELL PHONE 415-
756-1611



2) U R NOT WOMAN ENOUGH

SENT: FEBRUARY 6, 2006 05:31:24 AM FROM PLAINTIFF'S CELL PHONE 415-
756-1611

3) NO RESPECT, REGARD JUST COLD AND SELFISH II WAS TTHERE 4 U
HELPED U N SO MANY WAYS NOW I KNOW THE REAL U

SENT: FEBRUARY 6, 2006 05:27:54 AM FROM PLAINTIFF'S CELL PHONE 415-
756-1611

3) I WILL NEVER FORGET ALL THE EMOTIONAL STRESS AND GREIF YOU
CAUSED ME U TURNED OUT 2 B A VERY NASTY THEN U WANT 2
ABRUBTLY END IT AND LEAVE ME LIKE I MEANT NOTHING

SENT: FEBRUARY 6, 2006 05:23:15 AM FROM PLAINTIFF'S CELL PHONE 415-
756-1611

4) YOU FOOL YOURSELF N 2 BELEIVIING U R ACTING LIBERATED HAVING
THE ATTITUDE THAT U CAN DO WHAT YOU CAN BUT YOU HAVE POOR
JUDGEMENT AND NO REGARD



SENT: FEBRUARY 3, 2006 06:29:04 AM FROM PLAINTIFF'S CELL PHONE 415-
756-1611



5) YOU DON'T KNOW ANYTHING ABOUT RESPECT OR LOVE

SENT: FEBRUARY 3, 2006 05:29:48 PM FROM PLAINTIFF'S CELL PHONE 415-756-1611

6) U WANT TO FOOL YOURSELF N 2 THINKING IM JUST HURT & WANT 2 PUNISH U THAT'S BECAUSE U WANT 2 DANCE AROUND THE REAL ISSUE THE C

SENT: FEBRUARY 3, 2006 02:56:47 PM FROM PLAINTIFF'S CELL PHONE 415-756-1611

7) U RUN FROM PROBLEMS U R WEAK ANYTHING THAT REQUIRES RESPONSIBILTY U CANT HANDLE

SENT: FEBRUARY 3, 2006 02:50:53 PM FROM PLAINTIFF'S CELL PHONE 415-756-1611



8) YOUR ATTITUDE AND BEHAVIOR IS FUCKED UP BECAUSE YOUR BRAIN IS FRIED

SENT: FEBRUARY 3, 2006 02:38:18 PM FROM PLAINTIFF'S CELL PHONE 415-756-1611

9) U MAKE BELIEVE AND PRETEND U DON'T HAVE A PROBLEM

SENT: FEBRUARY 3, 2006 02:34:46 PM FROM PLAINTIFF'S CELL PHONE 415-756-1611

Exhibit 4

# CALL REPORT DETAILS

### ALERTLINE CONFIDENTIAL MEMORANDUM
#### THE INFORMATION CONTAINED IN THIS REPORT SHOULD BE HANDLED AS CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| **Report Number:** | AFSS-06-02-0170 | [9V64] | **Received By:** | LYNCHT |
| **Call Report Type:** | WPA Initial Report | | **Source:** | Telephone |
| **Awareness Resource:** | Wallet Card | | **Duration:** | 00:20:52 |
| **Language Used:** | English | | **Reviewed By:** | LYNCHT |
| **Date/Time Received:** | 2006-02-21 1:56 PM | Eastern Time Zone | **Investigator:** | Not Assigned |
| **Call Back Date:** | N/A | | **Case Status:** | Open |
| **Report Priority:** | B | | | |

## WORKPLACE ALERT INITIAL REPORT

| Allegation | Class | Priority |
|---|---|---|
| Managerial Misconduct | Workplace Conduct Issues | B |

**Location Details**

1753
BANK OF AMERICA RESTAURANT
555 CALIFORNIA ST
SAN FRANCISCO, CA 94104
United States

| Party Type | Party Name | Party Job Title |
|---|---|---|
| Caller | Mark  Foster | cook |
| | Phone:    Home (415) 756-1611 | |
| Other Involved Party | Matthew  (last name unknown) | chef |
| Subject | Yingkee  McVicker | supervisor |

**Call Report Summary**

Mark Foster believes his work place became hostile because Yingkee McVicker broke-off their relationship.

**Call Report Details**

Mark Foster and Yingkee McVicker were involved in a consensual relationship for 13 months until Yingkee broke-off the relationship three weeks ago. Yingkee did not give Mark any reason for breaking-off the relationship or expressed any remorse for doing so. Ever since then Mark has been depressed and angry over the issue.

Since the break-up, Mark and Yingkee do not communicate well and she treats Mark as if he is not there.

Mark believes there is a policy in place that forbids managers to indulge in irregular relationships with direct reports. Neither Yingkee nor Mark made anyone aware of their relationship but it was common knowledge among the employees.

Now Yingkee is involved with Matthew (last name unknown) and as a result, Yingkee gets special treatment from Matthew. She is allowed to report to work late; leave early, and Yingkee and Matthew take the same days off.

Now there is an issue with the way Matthew treats Mark. Mark advised Matthew on February 16,2006, that he could not report to work on February 18 because the schedule was changed in the middle of the week and Mark plannned to be off. Matthew told Mark that he must not value his job much if he refuses to report to work.

ARA/Fos
D 0112

Mark believes Yingkee is the cause for the entire Issue and Mark believes she should be moved to another location or reprimanded.

Mark was thanked for calling and was issued a report identification number.

**Communication Specialist's Comments**

Mark spelled all proper names included in this report.

**Report Number: AFSS-06-02-0170**

Client agrees and understands that Global Compliance Services neither warrants, vouches for, nor authenticates the reliability of the allegations provided in this report. Client agrees that it shall have the sole responsibility for investigating or otherwise evaluating these allegations and other information provided and to comply with all local, state and federal laws pertaining to the investigation and protection of such information, as well as the protection of all rights of any person or persons accused of any wrongdoing.

## RESPONSE

**No responses found for this call report.**

Exhibit  5

ALX # 030647547

## LEAVE OF ABSENCE REQUEST

**POSTED**

Employee's Name  MARK Antoine Foster

Social Security Number  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

Hire Date  9/8/05                    Unit  KitCHEN

Request Leave of Absence

To Start  March 30, 2006

To Return  No later than JuNe 15, 2006

To Be Read And Signed By Employee:

I understand that failure to report to work at the date specified above
means that I am quitting voluntarily and I will, therefore, be terminated
on that day.

_Mark A. Foster_
Employee's Signature

Reason for Request

Emotional Stress, mental anguish

_Mark A. Foster_                          March 28, 2006
Employee's Signature                      Date

APPROVALS:

Department Head  _____

Controller  _____        Date  3/28/06

Personnel  _James_____           Date  3/28/06
                                          Date

EMPLOYEE NOTIFIED OF DECISION ON  3/29/06

ARA/Fos
D 0073

**EXHIBIT 6**

# VOLUNTARY RESIGNATION

I, Mark Foster, voluntarily resign my position with Aramark as of June 15, 2006.

_Mark Foster_    May 7, 2007
Mark Foster,        Date

1

## PROOF OF SERVICE

2

3

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is One Market, Spear Street Tower, San Francisco, California 94105-1126.

4

5

On January 4, 2008, I served the within document(s):

6

## DEFENDANTS' EARLY SETTLEMENT PROGRAM SETTLEMENT CONFERENCE STATEMENT

7

8

☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

9

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below.

10

11

☐ by placing the document(s) listed above in a sealed Federal Express envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a <u>Federal Express</u> agent for delivery.

12

13

☐ by causing the document(s) listed above to be personally delivered to the person(s) at the address(es) set forth below.

14

☐ by transmitting via electronic mail the document(s) listed above to each of the person(s) as set forth below.

15

16

**Bruce Highman**
**Highman Highman & Ball**
**870 Market Street, Suite 467**
**San Francisco, Ca 94102**

**Ronald Souza**
**Lynch, Gilardi & Grummer**
**475 Sansome Street, Suite 1800**
**San Francisco, Ca 94111**

17

18

19

**San Francisco Superior Court**
**Early Settlement Program**
**The Bar Association Of San Francisco**
**301 Battery Street, 3rd Floor**
**San Francisco, Ca 94111**

**Mark Foster, In Pro Per**
**200 Corpus Christi Road, #A**
**Alameda, CA 94501**

20

21

22

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

23

24

25

Executed on January 4, 2008, at San Francisco, California.

26

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.

27

*Mary Gonzalez*

Mary Gonzalez

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

1-SF/7650616.1

Case No. CGC-07-461178